```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        -  -  -

4    GRAPE TECHNOLOGY GROUP, INC.,   )      Civil Action
     and KGB USA, INC.,              )
5                                    )
              Plaintiffs,            )
6                                    )
         v.                          )
7                                    )
     JINGLE NETWORKS, INC.,          )
8                                    )
              Defendant.             )      No. 08-408-GMS
9
                         -  -  -
10
                   Wilmington, Delaware
11              Wednesday, December 8, 2010
                      9:00 a.m.
12
                         -  -  -
13
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
14                                      and a Jury

15   APPEARANCES:

16           RODGER D. SMITH, II, ESQ.
             Morris, Nichols, Arsht & Tunnell LLP
17                   -and-
             NICHOLAS GROOMBRIDGE, ESQ.,
18           MICHAEL EISENBERG, ESQ.,
             ALFREDO PEREZ DE ALEJO, ESQ., and
19           ROBERT WATKINS, ESQ.
             Weil, Gotshal & Manges
20           (New York, N.Y.)

21                          Counsel for Plaintiffs

22

23
                      FIFTH DAY OF TRIAL
24

25
```

1    APPEARANCES CONTINUED:

2            MARY MATTERER, ESQ.
             Morris James LLP
3                    -and-
             H. KEETO SABHARWAL, ESQ.,
4            ROBERT E. SOKOHL, ESQ.,
             MARK FOX EVENS, ESQ.,
5            DONALD R. BANOWIT, ESQ., and
             LORI A. GORDON, ESQ.
6            Sterne, Kessler, Goldstein & Fox P.L.L.C.
             (Washington, D.C.)
7
                             Counsel for Defendant
8

9
                        -   -   -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Sidebar conference not reported.)

2              MR. GROOMBRIDGE:  Your Honor, if we need to do

3    anything now, we would like to preserve it.  Sometimes the

4    Federal Circuit says that we should.

5              MR. SMITH:  It is a cautionary matter.

6              THE COURT:  Fair enough.

7              MR. GROOMBRIDGE:  Totally in an abundance of

8    caution.

9              THE COURT:  Why don't you say what you want to

10   say.

11             MR. GROOMBRIDGE:  Just on behalf of plaintiffs,

12   we wish to note our exception to the construction of the

13   term "closing prompt message."

14             THE COURT:  The ambiguous thing, okay.

15             MR. SABHARWAL:  Your Honor, we had already

16   agreed on this.  If it is okay with the Court, can the jury

17   when they are deliberating have a copy of the Court's claim

18   construction?

19             THE COURT:  They have the Court's claim

20   construction.

21             MR. SABHARWAL:  I wanted to check.

22             (End of sidebar conference.)

23             THE COURT:  Counsel, do both of you intend to

24   discuss the verdict form, or one of you?

25             MR. GROOMBRIDGE:  I believe the defendant does.

1    We do not plan to discuss the verdict form.

2              THE COURT:  I am going to save a little time.  I

3    think the form is self-explanatory.  I am not going to go

4    into the form.  I believe one of you is going to discuss it.

5              MR. SABHARWAL:  Yes, Your Honor.  Thank you.

6              (Jury enters courtroom at 11:35 a.m.)

7              THE COURT:  Good morning, members of the jury.

8    Please take your seats.

9              Please allow me to express, on behalf of the

10   parties and the Court, our profound regret at the delay and

11   thank you for your indulgence and your patience.

12             My fault.  I will take responsibility for the

13   delay.  Please, do not charge either party with any

14   responsibility.  It is entirely the Court's responsibility.

15             Each of you should now have a copy of the final

16   jury instructions.  And, again, I will advise that you

17   follow as you wish.

18             Members of the jury, now it is time for me to

19   instruct you about the law that you must follow in deciding

20   this case.

21             Each of you has been provided a copy of these

22   instructions.  And I have already told you, you may read

23   along or look up and listen as I deliver them, whatever is

24   easier for you.

25             I will start by explaining the duties and

general rules that apply in every civil case, your duties and the general rules.  Then I will explain some of the rules that you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law you will apply in this case.

And last, I will explain the rules that you must follow during your deliberations in the jury room and the possible verdicts you may return.

Insofar as that I am not going to discuss the jury verdict form to any great degree, I believe one or both of the parties may talk about it a little bit, but the form is really self-explanatory.  As patent cases go, it has been fairly easy in this case to follow.

So please listen carefully to everything I have to say.

Now, ladies and gentlemen, it is important that you bear in mind the distinction between your duties and mine.  You have two main duties as jurors.  The first is to decide what the facts are from the evidence that you saw and heard here in the courtroom.  You are the sole finders of fact.  It is your judgment, and your judgment alone, to determine what the facts are.  And nothing at all that I have said during this trial was meant to influence your decision about the facts, your determination about the facts

1    in any way.

2             Your second duty is to take the law that I give

3    to you, apply it to the facts that you find, decide whether

4    Jingle is liable for infringement and whether Grape's

5    asserted patents are invalid.  On Grape's assertion that

6    Jingle infringed either/or both the '371 patent or the '969

7    patent, you must decide whether Jingle is liable, and, if

8    so, the proper monetary damages to be awarded to Grape.  As

9    to Jingle's contentions, you must decide whether the '371

10   patent is invalid and whether the '969 patent is invalid.

11            Now, as far as my duty is concerned, I have the

12   duty of advising you about the law, and you should apply it

13   to the facts as you find them.  You are not to consider

14   whether the principles I state to you are sound or whether

15   they accord with your own view about policy.  You are bound

16   by the oath that you took at the beginning of the trial to

17   follow the instructions that I give you, even if you

18   personally disagree with them.  You must accept them despite

19   how you feel about their wisdom or lack of wisdom.  This

20   includes the instructions that I gave you before and during

21   the trial, and these instructions as well.  All the

22   instructions are important, and you should consider them

23   together as a whole.

24            Please perform these duties fairly.  Do not let

25   any bias, sympathy, or prejudice that you may feel toward

1    one side or the other influence your decision in any way.

2              Let's talk about evidence again.

3              You must make your decision based only on the

4    evidence that you saw and heard here in court.  Do not let

5    rumors, suspicions, or anything else that you may have seen

6    or heard outside of court influence you or your decision in

7    any way.

8              The evidence in this case includes only what the

9    witnesses said while they were testifying under oath,

10   deposition testimony and videotape testimony that was

11   presented to you, the exhibits that I allowed into evidence,

12   and the stipulations to which the lawyers agreed.

13             Nothing else is evidence.  The lawyers'

14   statements and arguments are not evidence.  The arguments of

15   the lawyers are offered solely as an aid to help you in your

16   determination of the facts.  Their questions and objections

17   are not evidence.  My legal rulings are not evidence.  My

18   comments and questions are not evidence.  During the trial I

19   may not have let you hear some of the answers to some of the

20   questions that the lawyers asked.  I also may have ruled

21   that you could not see some of the exhibits that the lawyers

22   wanted you to see.  And sometimes I may have ordered you to

23   disregard things that you saw or heard or struck things from

24   the record.  You must completely ignore all of these things.

25   Do not speculate about what a witness might have said or

1    what an exhibit might have shown.  These things are not

2    evidence, and you are bound by your oath not to let them

3    influence your decision in any way.

4         Make your decision based only on the evidence,

5    as I have defined it here, and nothing else.

6         You have heard the terms direct and

7    circumstantial evidence.

8         Again, direct evidence is simply testimony like

9    the testimony of an eyewitness which, if you believe it,

10   directly proves a fact.  If a witness testified that she saw

11   it was raining outside and you believed her, that would be

12   direct evidence that it was raining.

13        Now, circumstantial evidence is simply a chain

14   of circumstances that indirectly proves a fact.  If someone

15   walked into the courtroom, for instance, wearing a raincoat

16   covered with drops of water and carrying a wet umbrella,

17   that would be circumstantial evidence from which you could

18   conclude it was raining.

19        It is your job to decide how much weight to give

20   the direct and circumstantial evidence.  The law makes no

21   distinction between the weight that you should give to

22   either one, nor does it say that one is better than the

23   other.  You should consider all the evidence, both direct

24   and circumstantial, and give it whatever weight you believe

25   it deserves.

1            You should use your common sense in weighing the

2     evidence.  Consider it in light of your every-day experience

3     with people and events, and give it whatever weight you

4     believe it deserves.  If your experience tells you that

5     certain evidence reasonably leads to a conclusion, you are

6     free to reach that conclusion.

7            A further word about statements of counsel and

8     their arguments.

9            The attorneys' statements and arguments, again,

10    I want to emphasize, are not evidence.  Instead, their

11    statements and arguments are intended to help you review the

12    evidence presented.  If you remember the evidence

13    differently from the attorneys, you should rely, you must

14    rely on your own recollection.

15           The role of attorneys is to zealously and

16    effectively advance the claims of the parties they represent

17    within the bounds of the law.  An attorney may argue all

18    reasonable conclusions from the evidence in the record.  It

19    is not proper, however, for an attorney to state an opinion

20    as to the truth or falsity of any testimony or evidence.

21    What an attorney personally thinks or believes about the

22    testimony or evidence in a case is simply not relevant, and

23    you are instructed to disregard any personal opinions or

24    evidence that an attorney has offered during the opening or

25    closing statements or at any other time during the course of

1    these proceedings.

2         You are the sole judges of each witness'

3    credibility.  You should consider each witness' means of

4    knowledge; strength of memory; opportunity to observe; how

5    reasonable or unreasonable the testimony is; whether it is

6    consistent or inconsistent; whether it has been

7    contradicted; the witness' biases, prejudices or interests;

8    the witness' manner and demeanor while on the witness stand;

9    and all circumstances that, according to the evidence, could

10   affect the credibility of the testimony.

11        If you find the testimony to be contradictory,

12   you must try to reconcile it, if reasonably possible, so as

13   to make a harmonious story of it all.  But if you can't do

14   this, then it is your duty and privilege to believe the

15   testimony that, in your judgment, is most believable and

16   disregard any testimony that, in your judgment, is not

17   believable.

18        In determining the weight to give to the

19   testimony of a witness, ask yourself whether there is

20   evidence tending to prove that the witness testified falsely

21   about some important fact or whether there was evidence that

22   at some other time the witness said or did something, or

23   failed to say or do something, that was different from the

24   testimony he or she gave at trial or during a deposition.

25   You have the right to distrust such witness' testimony in

1    other particulars, and you may reject all or some of the

2    testimony of that witness or give it such credibility as you

3    may think it deserves.

4         You should remember that a simple mistake by a

5    witness does not necessarily mean that the witness was not

6    telling the truth.  People may tend to forget some things or

7    remember other things inaccurately.  If a witness has made a

8    misstatement, you must consider whether it was simply an

9    innocent lapse of memory or an intentional falsehood, and

10   that may depend upon whether it concerns an important fact

11   or an unimportant detail.

12        Now, this instruction applies to all witnesses.

13        Expert or opinion testimony is testimony from a

14   person who has special knowledge in some science,

15   profession, or business.  This knowledge is not common to

16   the average person but has been acquired by the expert

17   through special training or experience.

18        In weighing expert testimony, you may consider

19   the expert's qualifications, the bases for the expert's

20   opinion, and the reliability of the information supporting

21   the expert's opinions, as well as the factors I have

22   previously mentioned for weighing testimony of any other

23   witness.  You are not required to accept an expert's

24   opinions.  Expert testimony should receive whatever weight

25   and credit you think appropriate, given all other

1    circumstances or evidence in the case.

2              Two more points about witnesses.

3              First, sometimes jurors wonder if the number of

4    witnesses who testified makes any difference.  Do not,

5    ladies and gentlemen, make any decision based only on the

6    number of witnesses who testified.  What is more important

7    is how believable the witnesses were and how much weight you

8    think their testimony deserves.  Concentrate on that, not

9    the numbers.

10             Second, do not make any decision based on

11   whether the witness appeared to testify live or if the

12   witness testified by prerecorded video examination.

13             A little awkward, but I think you get the point.

14             Both forms of testimony are entitled to equal

15   weight.  No inferences should be drawn from whether a

16   witness testified live or by video.

17             Let's discuss burdens of proof.

18             This, as you know, is a civil case in which the

19   plaintiffs, Grape Technology and KGB USA, are charging the

20   defendant Jingle Network, Inc. with patent infringement.

21   Grape alleges that Jingle's directory assistance service has

22   infringed the asserted claims of Grape's patents.  Jingle

23   denies these charges and asserts that it does not infringe

24   Grape's patents.  Grape has the burden of proving its patent

25   infringement claims by a preponderance of the evidence.

1    That means Grape has to produce evidence that, when

2    considered in light of all the facts, leads you to believe

3    that what Grape claims is more likely true than not.  To put

4    it differently, if you were to put Grape's and Jingle's

5    evidence on opposite sides of a scale, the evidence

6    supporting Grape's claims would have to make the scales tip

7    somewhat to its side, to Grape's side.

8            Jingle also asserts that Grape's patents are

9    invalid.  As you know, a patent is presumed to be valid.

10   Accordingly, Jingle has the burden of proving by clear and

11   convincing evidence that the patent is invalid.  Clear and

12   convincing evidence is evidence that produces an abiding

13   conviction that the truth of a factual contention is highly

14   probable.  Proof by clear and convincing evidence is, thus,

15   a higher burden than proof by a preponderance of the

16   evidence.

17           Now, those of you who are familiar with criminal

18   cases will recall the term "proof beyond a reasonable

19   doubt."  That burden does not apply in a civil case, and you

20   should therefore put it out of your mind in considering

21   whether or not the parties have met their burdens of proof.

22           You already know who the parties are.  I am not

23   going to go through that.

24           Now, Grape contends that Jingle has infringed

25   Claims 4, 5, 7, and 8 of the '371 patent, and Claims 1, 5,

20, and 25 of the '969 patent by making, using, selling, and

offering for sale a directory assistance service that falls

within or performs methods falling within the scope of one

or more of the claims of those patents.

Grape contends that it has been damaged by

Jingle's infringement of the '371 and '969 patents and that

Grape is thus entitled, among other things, to an award of a

reasonable royalty, as provided by statute.

Jingle, for its part, contends that it does not

infringe any of the asserted claims of the '371 or '969

patents because Grape has not proven that it is more likely

than not that Jingle's free directory assistance service

meets every limitation of the asserted claims of those

patents.

Jingle further contends that the patents are

invalid, that both the '371 and '969 patents are invalid.

Specifically, Jingle contends that the '371 is not new

and/or is obvious in view of the prior art.  Jingle also

contends that the '969 patent is invalid because it is not

new and/or obvious in view of the prior art.

Let me summarize for you now the issues that you

must decide.  They are eight in number.

First, whether Grape has proven by a

preponderance of the evidence that Jingle's directory

assistance service infringes any of the asserted claims of

1    the '371 patent;

2                Next.  Whether Grape has proven by a

3    preponderance of the evidence that Jingle's directory

4    assistance service infringes any of the asserted claims of

5    the '969 patent;

6                Next.  Whether Jingle has established by clear

7    and convincing evidence that the asserted '371 claims are

8    invalid due to anticipation by prior patents;

9                Next.  Whether Jingle has established by clear

10   and convincing evidence that the asserted '371 claims are

11   obvious over one or more prior patents;

12               Whether Jingle has established by clear and

13   convincing evidence that the asserted '969 claims are

14   invalid due to anticipation by prior art patents;

15               Whether Jingle has established by clear and

16   convincing evidence that the asserted '969 claims are

17   obvious over one or more patents, prior patents.

18               If you find that Jingle has infringed any valid

19   asserted claims of the '371 patent, what amount of damages

20   are due Grape;

21               And likewise, if you find that Jingle has

22   infringed any valid asserted claims of the '969 patent, what

23   amount of damages are due Grape.

24               Infringement, what is it?

25               Before you can decide whether Jingle has

infringed the asserted claims of the '371 and/or '969

patents, you will need to understand patent claims.  Patent

claims define in words the boundaries of what the patentee

claims as his or her invention.

The patent claims are the numbered paragraphs at

the end of the patent.  The patent claims at issue here,

otherwise known as the asserted claims, are Claims 4, 5, 7,

and 8 of the '371 patent and Claims 1, 5, 20, and 25 of the

'969 patent.  Only the claims, ladies and gentlemen, only

the claims of a patent can be infringed.  Neither the

specification, which, as you know, is the written

description of the invention, or the drawings of a patent

can be infringed.  The specification and the drawings

describe certain embodiments of the invention.  Limitations

of those embodiments may not be incorporated into the

claims.  Each of the claims must be considered individually,

and to show infringement of a patent, Grape need only

establish that one of the patent claims has been infringed.

You have a copy of the patents in your binders,

I believe.

As I have already said, the claims at issue

are...,  and I have told you those.

I will now explain to you the meaning, as was

stated earlier in these proceedings, of some of the words of

the claims in this case.  In doing so, I will explain some

1   of the requirements of the claims.  As I have previously

2   instructed, you must accept my definition of these words in

3   the claims as correct, regardless of anything you have heard

4   in these proceedings about ambiguity or anything else like

5   that.  For any words in the claim which I have not provided

6   you with a definition, you should apply their common

7   meaning.  You should not take my definition of the language

8   of the claims as an indication that I have a view regarding

9   how you should decide the issues that you are being asked to

10  decide, such as infringement or invalidity.  These are for

11  you to decide.

12          I will now provide you with a list of claim

13  terms from each patent and the meaning of the terms I have

14  construed or the meaning upon which the parties have agreed.

15  Now, you will see at the end of your instructions an

16  appendix, Appendix A, that has these definitions there for

17  you as well.

18          For the '371 patent, the claims at the end of

19  the patent start in Column 30, Line 39.  In a patent, the

20  column number is displayed at the top, as you have seen, and

21  the line numbers are displayed in the center.  So here are

22  the claims to be construed in the '371 patent:

23          The term "ordered as a function of" is construed

24  to have its plain and ordinary meaning.

25          The parties have agreed that the term

1     "compensation given to the directory assistance provider by

2     the selected businesses" means "payment from the businesses

3     identified by a search to the directory assistance

4     provider."

5                 For the '969 patent, you know what the claims at

6     issue are.  The claim terms construed in the '969 patent

7     are:  The term "subscriber" is construed to mean "any

8     individual or business entity whose information is stored

9     for retrieval by the communication assistance system."

10                The term "information corresponding to a

11    plurality of subscribers," and "information corresponding to

12    each of said subscribers," are construed to mean "data

13    associated with subscribers."

14                The term "a subscriber information other than

15    the subscriber information requested by said requester" is

16    construed to have its plain and ordinary meaning.

17                The term "telephone switch" is also construed to

18    have its plain and ordinary meaning.

19                The term "a first database" is construed to have

20    its plain and ordinary meaning.

21                The term "closing prompt message" is construed

22    to mean "a message provided to a calling party upon

23    completion of the information assistance call but prior to

24    connecting to the subscriber."

25                The term "selecting a closing prompt code from a

1    plurality of available closing prompt codes," "selects said

2    closing prompt code from any one of said available closing

3    prompt codes," and "selection of said closing prompt code by

4    said closing prompt code module is from any one of said

5    available closing prompt codes...relating to a subscriber

6    information other than the subscriber information requested

7    by said requester," these are all construed, incredibly

8    enough, to have their plain and ordinary meanings.

9           The term "available closing prompt codes" is

10   construed to have its plain and ordinary meaning.

11          The term "desired closing prompt message" is

12   construed to mean "a closing prompt message identified by a

13   specific closing prompt code."

14          And finally, the term "available closing prompt

15   messages" is construed to have its plain and ordinary

16   meaning.

17          Now, a patent owner has the right to stop others

18   from using the invention covered by its patent during the

19   life of the patent.  If a persons uses, sells, or offers to

20   sell within the United States, or imports into the United

21   States, what is covered by the patent claims without the

22   patent owner's permission, that person is said to infringe

23   the patent.  There are two types of direct infringement.

24   The first is literal infringement and then there is

25   infringement under the doctrine of equivalents.

1              I will explain both types in a few moments.

2              Deciding whether a claim has been directly

3    infringed is a two-step process, essentially.  First, I

4    determine the meaning of the patent claims as a matter of

5    law.  I have just given those definitions to you.  This is

6    my job, and I have instructed you.  Second, you must compare

7    each claim as I have interpreted it to the accused service

8    to determine whether or not every element of the claim can

9    be found in the accused service.  Now, this

10   element-by-element comparison is your responsibility as a

11   jury in this case.

12             Keep in mind that intent to infringe, actual

13   knowledge of a patent, or knowledge that one is infringing a

14   patent, are not part of a claim for patent infringement.

15             Literal infringement.

16             To determine literal infringement, you must

17   compare the accused service with each and every one of the

18   element of the claim.  When the accused service meets all of

19   the requirements of a claim, the product is said to

20   literally infringe that claim.

21             For Jingle's directory assistance service, to

22   literally infringe any of the asserted claims of the '371

23   patent, Grape must establish by a preponderance of the

24   evidence that each and every element of the patent claim is

25   found in Jingle's directory assistance service.  In other

1    words, each asserted claim is literally infringed if

2    Jingle's directory assistance service includes each and

3    every element in the asserted claim.  If Jingle's service

4    omits any single element recited in an asserted claim,

5    Jingle does not literally infringe that claim.  You must

6    determine literal infringement with respect to each patent

7    claim individually.

8            Remember, the question is whether Jingle's

9    directory assistance service infringes an asserted claim of

10   Grape's patent and not whether Jingle's service is similar

11   or even identical to a product or service offered by Grape.

12   Accordingly, you must be certain to compare the accused

13   Jingle service with the claim it is alleged to infringe and

14   not with any product made by Grape.

15           Now, doctrine of equivalents infringement.

16           If you do not find literal infringement of a

17   claim, you may consider infringement under the doctrine of

18   equivalents.  I have referred to the doctrine of equivalents

19   before.  It is time to explain it.

20           As I have noted, to infringe a patent, every

21   element must be present in the accused product.  A claim

22   element may be present in an accused product in one or two

23   ways, either literally or under the doctrine of equivalents.

24   A claim element is literally present, as you know, if it

25   exists in the accused product just as it is described in the

claim, either as I have explained that language to you or,

if I did not explain it, as you understand it from the

evidence presented during the trial.

A claim element is present in an accused product

under the doctrine of equivalents if the differences between

the claim element and a corresponding aspect of the accused

product are insubstantial.  One way to determine this is to

look at whether or not the accused structure performs

substantially the same function, in substantially the same

way, to achieve substantially the same result as the element

in the claimed invention.  Another way is to consider

whether people of ordinary skill in the art believe that the

structure of the accused product and the element recited in

the patent are interchangeable.

It is not a requirement under the doctrine of

equivalents that those of ordinary skill in the art knew of

the equivalent when the patent application was filed or when

the patent issued.  The question of whether Jingle's product

and its elements are equivalent to those defined in Grape's

claims is to be determined as of the time of the alleged

infringement.

Equivalence is determined at the time of the

activities accused of infringement and is not limited by

what was known at the time the patent application was filed

or when the patent issued.  Thus, the inventor need not have

1    foreseen, and the patent need not describe, all potential

2    equivalents to the invention covered by the claims.  Also,

3    slight changes in technique or improvements made possible by

4    technology developed after the patent application is filed

5    may still be equivalent for doctrine of equivalents

6    purposes.

7            In patent claims, "comprising" means that claims

8    are what we call open-ended.  As such, the claim is not

9    limited to only what is in the claim.  The preamble to Claim

10   4 of the '371 patent uses the phrase "method for providing a

11   directory assistance service by a directory assistance

12   provider comprising."  Similarly, Claim 8 of the '371 patent

13   uses the phrase "the method of Claim 4, further comprising";

14   Claim 1 of the '969 patent uses the phrase "a communication

15   assistance system for providing assistance to information

16   corresponding to a plurality of subscribers, the system

17   comprising"; and Claim 5 of the '969 patent uses the phrase

18   "the system in accordance with Claim 1, further comprising."

19   These claims are open-ended.  The word comprising is

20   interpreted the same as including or containing.  As such,

21   the claim is not limited to only what is in the claim.

22           Based on this explanation, if you find that

23   Jingle's directory assistance service includes all of the

24   elements of Claims 4, 5, 7 and/or 8 of the '371 patent, or

25   Claims 1, 5, 20 and/or 25 of the '969 patent, the fact that

1    Jingle's directory assistance service may also include

2    additional features or components is irrelevant.  The

3    presence of additional features or components in Jingle's

4    directory assistance service does not mean that the service

5    does not infringe a patent claim.

6           Now, patent invalidity is a defense to patent

7    infringement.  Even though the PTO, the Patent and Trademark

8    Office examiner has allowed the claims of a patent, you have

9    the ultimate responsibility for deciding whether or not the

10   claims of the patent are valid.

11          I will now instruct you on the invalidity issues

12   you should consider.  As you consider these issues, remember

13   that the party asserting that a patent is invalid bears the

14   burden of proving by clear and convincing evidence that the

15   asserted claims in the patent are invalid.

16          The granting of a patent by the PTO carries with

17   it the presumption that the patent's subject matter is new,

18   useful, and not obvious to one of ordinary skill in the art.

19   The law presumes, in the absence of clear and convincing

20   evidence to the contrary, that the Patent Office acted

21   correctly in issuing the patent.  Nevertheless, once the

22   validity of a patent has been put at issue, it is the

23   responsibility of you, the jury, to review what the Patent

24   Office has done consistent with these instructions on the

25   law.

1            Prior art may include, ladies and gentlemen,

2    publications or patents that disclose the claimed invention

3    or elements of the claimed invention.  To be prior art, the

4    item or reference must have been published or patented

5    before the date of the invention.  Additionally, a patent

6    may be prior art if the patent was filed before the date of

7    the invention, even though the patent issued after the date

8    of the invention.

9            For the '969 patent, the parties agree that the

10   date of invention is the filing date of the '969 patent,

11   January 24, 2001, and the date for prior art purposes of the

12   '371 patent is March 7, 2000.

13           I am referring to anticipation.

14           Jingle asserts that the claims of the '371

15   patent and the '969 patent are invalid because the invention

16   defined by the claims of those patents are not new.  This

17   defense is known as anticipation.  In this case, Jingle

18   asserts that Claims 4, 5, 7 and 8 of the '371 patent was

19   anticipated by the following prior art:

20           The '135 Paxson patent.

21           Jingle also asserts that Claims 1, 5, 20 and 25

22   of the '969 patent are anticipated by the following prior

23   art:

24           By the Armstrong patent, the '352 Armstrong

25   patent.

1            Anticipation of a claim is established only if

2    Jingle provides by clear and convincing evidence that (1)

3    the material upon which it relies is prior art under the

4    law; (2) if the material is prior art, that the prior art

5    contains each and every element of the claimed invention;

6    and finally, that the prior art contains enough information

7    to enable one skilled in the art to make and use the claimed

8    invention.

9            If you find that Jingle has failed to meet its

10   burden with respect to any of its these elements, then you

11   must find that the claims are not invalid for anticipation.

12           A piece of prior art anticipates a patent claim

13   if it discloses, either expressly or inherently, all of the

14   limitations of the claim.  There is not anticipation unless

15   every one of the limitations of the claimed invention is

16   found in a single piece of prior art.  If the piece of prior

17   art is silent about a limitation of a claim, it may still

18   anticipate that claim if it is inherently present in that

19   piece of prior art.  To prove that a limitation is inherent

20   in a piece of prior art, Jingle must show by clear and

21   convincing evidence that the missing matter is necessarily

22   present in the piece of prior art and that it would be

23   recognized by persons skilled in the art.  Inherency may not

24   be established by probabilities or possibilities.  Thus, the

25   allegedly inherent property must always be present.

1          Accordingly, the claims of '969 patent are

2    anticipated if each and every element of the claimed

3    invention was disclosed in a single piece of prior art

4    before January 24, 2001 and as to the '371 before March 7,

5    2000.

6          Obviousness.  In this case, Jingle contends that

7    the subject matter of Claims 4, 5, 7, and 8 of the '371

8    patent and Claims 1, 5, 20 and 25 of the '969 patent would

9    have been obvious to persons of ordinary skill in the art at

10    the time the inventions were made.

11          A patent claim is invalid if the claimed

12    invention would have been obvious to a person of ordinary

13    skill in the field at the time of invention.  You have the

14    responsibility for determining several factual questions

15    that are needed to enable me to make this decision.

16          First, for each claim that is alleged to be

17    invalid, you must decide the level of ordinary skill in the

18    field of the invention that someone would have had at the

19    time the claimed invention was made.

20          Second, you must decide the scope and content of

21    the prior art relative to each claim that is alleged to be

22    invalid.

23          Third, you must decide what difference, if any,

24    existed between the claimed invention and inventions and the

25    prior art.

1          Now, keep in mind that the existence of each and

2     every element of the claimed invention in the prior art does

3     not necessarily prove obvious.  Most, if not all, inventions

4     rely on building blocks of prior art.  In considering

5     whether a claimed invention is obvious, you may but are not

6     required to find obviousness, if you find that at the time

7     of the claimed invention there was a reason that would have

8     prompted a person having ordinary skill in the field of the

9     art to combine the known elements in a way the claimed

10    invention does, taking into account such factors as whether

11    the claimed invention was merely the predictable result of

12    using prior art elements according to their known function

13    or functions; whether the claimed invention provides an

14    obvious solution to a known problem in the relevant field;

15    whether the prior art teaches or suggests the desirability

16    of combining elements claimed in the invention; whether the

17    prior art teaches away from combining elements in the

18    claimed invention; whether it would have been obvious to try

19    combinations of elements, such as when there is a design

20    need or market pressure to solve a problem and there are a

21    finite number of identified predictable solutions; and

22    finally, whether the change resulted more from design

23    incentives or other market forces.  To find it rendered the

24    invention obvious, you must find that the prior art provided

25    a reasonable expectation of success.

1              In determining whether the claimed invention was

2      obvious, consider each claim separately, please.

3              I am not going to read this instruction to you.

4      On its face, it deals with all of the prior art that you

5      must consider and first determine the scope and content you

6      must determine.  They are all the patents, and the common

7      name by which they are known in the parenthetic is right

8      next to the patent.

9              The next factor that you must consider is the

10     differences, if any, the between the prior art and the

11     claimed invention.  Although it is proper for you to note

12     any differences between the claimed invention and the prior

13     art, it is improper to consider the invention as only the

14     differences because the test is whether the claimed

15     invention as a whole would have been obvious over all of the

16     prior art.  Each claim, again, must be considered in its

17     entirety.

18             You next must determine the level of ordinary

19     skill in the art to which the claimed invention pertains at

20     the time the claimed invention was made.  Obviousness is

21     determined from the perspective of a person of ordinary

22     skill.  This person is presumed to know all of the prior art

23     and not just what the inventor may have known.  In deciding

24     what the level of ordinary skill in the field of the art is,

25     you should consider all of the evidence introduced at trial,

including but not limited to the following:  the levels of

education and experience of the inventor and other persons

actively working in the field; the types of problems

encountered in the field; prior art solutions to those

problems; rapidity with which innovations are made; and the

sophistication of the technology.

Now, the question of nonobviousness is simple to

ask, but on occasion difficult to answer.  The person of

ordinary skill in the art is presumed to have knowledge of

the relevant prior art at the time of the invention.  If you

find the available prior art shows each of the elements of

the asserted claims, you must determine whether it would

then have been obvious to a person of ordinary skill in the

art to combine or coordinate these elements in the same

manner as the asserted claims.  The difficulty that attaches

to honest attempts to answer this question can be attributed

to the strong temptation to rely on hindsight while

undertaking the evaluation.  It is wrong to use the '371 and

'969 patents as a guide through the maze of prior art

references, to combine the right references in the right way

so as to achieve the result of the asserted claims.

You must put your mind back to the time of the

invention and what one of ordinary skill in the art would

have known then.

If, after all of the evidence and the law as I

1    have stated it, after considering all of this, you are

2    convinced that the patent is not infringed or invalid, your

3    verdict should be for Jingle and you need go no further in

4    your deliberations.  On the other hand, if you decide that

5    one or more of the asserted patent claims is not invalid,

6    and that the claim has been infringed by Jingle, you must

7    then turn to the issue of damages.

8            The patent laws provide that in the case of

9    infringement of a valid patent claim, the owner of the

10   patent, Grape in this instance, shall be awarded damages

11   adequate to competent for the infringement but in no event

12   less than a reasonable royalty for the use made of the

13   invention by the infringer.  Damages are compensation for

14   all losses suffered as a result of the infringement.

15           It is not relevant to the question of damages

16   whether Jingle benefited from, realized profits from or even

17   lost money as a result of the acts of infringement.  The

18   only issue here is the amount necessary to adequately

19   compensate Grape for Jingle's infringement.  Adequate

20   compensation should return Grape to the position it would

21   have opened had there been no infringement.  You must

22   consider the amount of injury suffered by Grape without

23   regard to Jingle's gains or losses from the infringement.

24           The amount of damages must be adequate to

25   compensate Grape for the infringement, but it may not be

1    less than a reasonable royalty.  At the same time, your

2    damages determination must not include additional sums to

3    punish the party or to set an example.  You may award

4    compensatory damages only for the loss that the patent owner

5    proves, by a preponderance of the evidence, which the loss

6    proved was -- let me do that again.

7              You may award compensatory damages only for the

8    loss that the patent owner proves, by a preponderance of the

9    evidence, was caused by the alleged infringer's

10   infringement.

11             The fact that I am instructing you about damages

12   does not mean that Grape is or is not entitled to recover

13   damages.  I am expressing no opinion one way or the other.

14   These instructions are only to guide you in case you find

15   that Jingle infringed a valid claim of the '371 or '969

16   patent patents.

17             Once the fact of damages has been proven by a

18   finding of infringement, you must determine the extent of

19   damages.  Under the patent law, Grape is entitled to all

20   damages that can be proven with reasonable certainty.  On

21   one hand, reasonable certainty does not require proof of

22   damages with mathematical precision.  Mere difficulty in

23   ascertaining damages is not fatal to Grape.  On the other

24   hand, Grape is not entitled to speculative damages, that is,

25   you shall not award any amount for loss, which, although

1   possible, is wholly remote or left to conjecture and/or

2   guess.  You may base your evaluation of reasonable certainty

3   on opinion evidence.

4        Finally, any of doubts regarding the computation

5   of the amount of damages should be resolved against Jingle.

6        Now, if you find that Jingle's making, use,

7   offer for sale, or sale of a feature of Jingle's directory

8   assistance service infringes Grape's patents, then Grape is

9   entitled to a reasonable royalty on Jingle's sales.  A

10  reasonable royalty is the minimum permissible measure of

11  damages set by the patent laws, as you know, and is not

12  necessarily the actual measure of damages, but is merely the

13  floor below which damages should not fall.

14       A reasonable royalty in this case is the amount

15  of money that would be agreed to in a hypothetical

16  arm's-length negotiation between the patent owner and the

17  infringer, with both operating under the assumption that the

18  negotiated patent is valid and is being infringed, that is,

19  that absent the reasonable royalty payment, that the

20  infringer would respect the patent.

21       In determining a reasonable royalty, you should

22  place yourself at the point in time at which you believe the

23  arm's-length negotiation that I just referred to would have

24  been likely to have occurred.  This is typically just before

25  liability for infringement would begin.  The negotiation for

the '371 patent would have taken place sometime in early

2007, when Jingle launched the accused service.  The

negotiation for the '969 patent would have taken place

earlier in April of 2006, when the patent was issued.

In the hypothetical arm's-length negotiation,

you must assume that the person negotiating on behalf of

Jingle, and who was willing to take a license, would have

known that Grape's patents were valid and infringed by

Jingle.  You should also assume that both Grape and Jingle

knew all pertinent information at the time of the

hypothetical negotiations.

Having that in mind, you may consider any

relevant fact in determining the reasonable royalty for

Jingle's use of the patented invention, including the

opinion including the opinion testimony of experts.

The Georgia-Pacific factors.

In determining such a reasonable royalty, some

of the factors you should consider are as follows:

The royalties received by the patentee for

licensing others under the patents in suit;

The rates paid by the licensee for the use of

other patents comparable to the patents in suit;

The nature and scope of the license, that is as

exclusive or nonexclusive, or as restricted or unrestricted

in terms of territory or with respect to whom the

1    manufactured product may be sold;

2           The licensor's established policy and marketing

3    program to maintain his patent exclusivity by not licensing

4    others to use the invention or by granting licenses under

5    special conditions designed to preserve that exclusivity;

6           The commercial relationship between the licensor

7    and the licensee, such as, whether they are competitors in

8    the same territory in the same line of business; or whether

9    they are inventors or promoters;

10          The effect of selling the patented specialty in

11   promoting sales of other products of the licensee, the

12   existing value of the invention to the licensor as a

13   generator of sales of his nonpatented items, and the extent

14   of such derivative or what's called convoyed sales; the

15   duration of the patent and the term terms of the licenses;

16          The established profitability of the product

17   made under the patent, its commercial success and its

18   current popularity;

19          The utility and advantages of the patent

20   property over the old modes or devices, if any, that had

21   been used for working out similar results;

22          The nature of the patented invention, the

23   character of the commercial embodiment of it as owned and

24   produced by the licensor, and the benefits to those who have

25   used the invention;

1          The extent to which the infringer has made use

2     of the invention, and any evidence probative of the value of

3     that use;

4          The portion of the profit or of the selling

5     price that may be customary in the particular business or in

6     comparable businesses to allow for the use of the invention

7     or analogous inventions;

8          The portion of the realizable profit that should

9     be credited to the invention as distinguished from

10    nonpatented elements, the manufacturing process, business

11    risks, or significant features or improvements added by the

12    infringer;

13         The opinion testimony of qualified experts; and

14    finally,

15         Any other economic factor that a normally

16    prudent businessperson would, under similar circumstances,

17    take into consideration in negotiating the hypothetical

18    license.

19         No one factor is dispositive, ladies and

20    gentlemen, and you can and should consider the evidence that

21    has been presented to you in this case on each of these

22    factors.  You may also consider any other factors that in

23    your mind would have increased or decreased the royalty the

24    infringer would have been willing to pay and the patent

25    owner would have been willing to accept, acting as normally

prudent businesspeople.  The final factor establishes the

framework that you should use in determining a reasonable

royalty.  That is the payment that would have resulted from

a negotiation between the patent holder and the infringer

taking place at a time prior to when the infringement began.

Now, ladies and gentlemen, once you have

adjourned to the jury room, the first thing I recommend you

do is select a foreperson.  How you conduct your

deliberations is entirely up to you.  But however you

conduct those deliberations, please remember that your

verdict must represent the considered judgment of each

juror.

It is your duty, as jurors, to consult with one

another and to deliberate with a view toward reaching an

agreement, if you can do so without violence to your

individual judgment.  Each of you must decide the case for

yourself, but do so only after an impartial consideration of

the evidence with your fellow jurors.  In the course of your

deliberations, do not hesitate to reexamine your own views

and change your opinion, if you are convinced it is

erroneous.  But do not surrender your honest conviction as

to the weight or effect of evidence solely because of the

opinion of your fellow jurors or for the purpose of

returning a verdict.  Remember at all times that you are not

partisans.  You are the finders of fact.  Your sole interest

1   is to seek the truth from the evidence in the case.  In

2   order for you as a jury to return a verdict, it is necessary

3   that each juror agree to the verdict.  In other words, your

4   verdict must be unanimous.

5               A form of verdict has been prepared for you.

6   You will take the form into the jury room, and when you have

7   reached -- as I was saying, you will take the form of

8   verdict into the room with you, the deliberation area, and

9   when you have reached unanimous agreement as to the verdict,

10  your foreperson will fill in and sign the form and date it.

11  You will then return to the courtroom and your foreperson

12  will be asked to give the form over to my Chief Deputy, Ms.

13  Walker, and I will examine the form and she will then

14  announce your verdict.

15              It is proper to add the caution that nothing

16  said in these instructions and nothing in the form of

17  verdict is meant to suggest or convey in any way or manner

18  any intimation as to what verdict I think you should find.

19  What the verdict shall be is your sole and exclusive

20  responsibility.

21              That concludes the part of the instructions

22  explaining the rules for considering the testimony and

23  evidence.  Let me finish up by explaining how to communicate

24  with the Court.

25              Once you start deliberating, don't talk to the

1    jury officer -- there will be one right outside your area --

2    to my deputy clerk, or to me, or to anyone else except each

3    other about the case.  If you have questions or messages,

4    write them down on a piece of paper, your foreperson will

5    sign them and give them over to the jury officer.  The

6    question will then be given to me.  I will respond as soon

7    as I can.  I may have to talk to the lawyers about what you

8    have asked, so it may take me a bit of time to get back to

9    you.

10            One more thing about messages.  Do not ever

11   write down or tell anyone how you stand on your vote.  For

12   example, don't write down or tell anyone, other than

13   yourselves, that you are split or whatever your vote happens

14   to be.  That should stay secret until you are finished.

15            Now that all the evidence is in, once the

16   arguments are completed, you will be free to talk about the

17   case in the jury room.  In fact, it will be your duty to

18   speak with one another, to talk with one another about the

19   evidence and to make every reasonable effort you can to

20   reach a unanimous agreement.  Talk with each other, listen

21   carefully and respectfully to each other's views.  Keep an

22   open mind as you listen to what your fellow jurors have to

23   say.

24            Try your best to work out your differences.

25   Don't hesitate to change your mind if you are convinced that

```
 1    other jurors are right and your original position was wrong.

 2              But do not ever change your mind just because

 3    other jurors see things differently, or just to get the case

 4    over with.  In the end, your vote must be exactly that --

 5    your own vote.  It is important for you to reach unanimous

 6    agreement, but only if you can do so honestly and in good

 7    conscience.

 8              No one will be allowed to hear your discussions

 9    in the jury room and no record will be made of what you say.

10    So you should all feel free to speak your minds.

11              Again, let me finish up by repeating something I

12    said earlier.  Nothing that I have said or done during this

13    trial was meant to influence your decision in any way,

14    ladies and gentlemen.  You must decide the case for yourself

15    based on the evidence presented.

16              Let me see counsel.

17              (The following took place at sidebar.)

18              THE COURT:  We have a bit of a dilemma.  I have

19    a very important call I have to take at 1.  The jury's lunch

20    won't be here until 1.

21              MR. GROOMBRIDGE:  I think we should break now

22    and resume after they have had lunch, so we don't interrupt

23    the opening.

24              MR. SABHARWAL:  That is fine with me.

25              (End of sidebar conference.)
```

1          THE COURT:  We have a logistical challenge.  I

2    have a very important call to take at 1:00.  I cannot

3    postpone the call.  I don't want to interrupt the speeches

4    of counsel.

5          Your lunch has been ordered and is due at 1.  I

6    will offer you this.  For those of you who are starving and

7    don't want to wait for lunch, you can go get it.  But

8    otherwise, your lunch will be here at 1:00.

9          We will -- how much time would you like to eat,

10   half-hour, hour?  It's up to you.

11         Half an hour.  All right.  So we will resume at

12   1:30.  I will make sure I am off my call at 1:30.  That

13   should work out nicely.

14         We will recess now.

15         (Jury leaves courtroom at 12:27 p.m.)

16         (Luncheon recess taken.)

17          THE COURT:  Ms. Walker, please bring in the

18   jury.

19         (Jury enters courtroom at 1:37 p.m.)

20         THE COURT:  All right, ladies and gentlemen.

21   Please take your seats.

22         Mr. Groombridge.

23         MR. GROOMBRIDGE:  Thank you, Your Honor.

24         Your Honor, we have some slides.  If it would be

25   convenient for the Court, we can hand up hard copies.

1          THE COURT:  I will watch on the screen.

2          MR. GROOMBRIDGE:  Good afternoon, ladies and

3    gentlemen.

4          Welcome back.  We are coming to the end of these

5    proceedings.  I would like to review what has happened over

6    the past four days here.  But I would like to start with the

7    question of validity while that is fresh in our minds.

8          When we had Mr. Lanning here yesterday and Dr.

9    Forys here yesterday, they were talking about validity.

10          I want to begin with that and work through the

11    issues there, and explain to you our view of how the

12    evidence came in and what the result should be here.

13          And let's begin here by going back to the first

14    day of the trial.

15          Do you recall that Mr. Sabharwal showed you this

16    slide.  And he said that the defendant here, Jingle, was

17    going to present evidence that they had conducted searches

18    and they had found a huge pile of directory assistance

19    patents and that we would be seeing these, and these patents

20    would demonstrate why it was that two patents belonging to

21    the plaintiff, Grape, were invalid.

22          What did we see?  What we saw in the end is only

23    two patents out of that big mountain of patents, only two

24    that were even alleged, even contended to be the same

25    inventions as the ones in the patents that are the subject

1    of this lawsuit.

2              What I would like to do now is go through the

3    allegations that were made by the defendant as to why the

4    defendant says the two patents in this lawsuit are invalid.

5    Let's start with the first patent, the targeted advertising

6    patent.

7              You will recall, ladies and gentlemen, that Dr.

8    Forys put up this timeline.  And he said, well, I have

9    examined the prior art.  Remember, Dr. Forys had a great

10   many years, some 40 years experience in the

11   telecommunications industry.  And he had conducted searches,

12   and he had looked just as a hard as he could to find

13   product, to find earlier patents that could be used in his

14   opinion to invalidate the patents that are the subject of

15   this lawsuit.  And he said that these were the ones that he

16   would rely on for that purpose.

17             So let's work through them.  I would like to

18   demonstrate to you why, in our view, they in no way, shape,

19   or form compel a result that the patents in this lawsuit

20   should be held invalid.

21             First of all, Dr. Forys, although he put out

22   this slide, this slide was shown to us at the beginning of

23   the trial, there is a few things in here that he never even

24   mentioned while he was on the stand.  So let's take those

25   out.  There we go.  Let's get rid of those ones.  There was

1    no evidence whatsoever as to those.

2                Then there were another group of patents that he

3    said, he admitted, well, these are not directory assistance

4    patents.  So let's take those ones out.

5                And then there was, looking at the remaining

6    patents or looking at the ones that are left, even looking

7    at the ones that didn't come from the field of directory

8    assistance, he said, well, I agree, maybe they are not quite

9    the same, but they render the invention obvious.

10               And let's talk about obviousness.  Let's talk

11   about that, because what we think went on here was that Dr.

12   Forys took the patents involved in this lawsuit, these

13   patents, and he used them as a guideline or a roadmap to go

14   back and to pick out, define one piece here, and another

15   piece here, and another piece here, and tried to put them

16   together and say, oh, look, I found everything.  These ones

17   must have been obvious.

18               Well, that's not the way we do things.

19               As we were hearing the instructions this morning

20   from the Judge, I noted a couple of things, a couple of

21   things that I think are very important on this issue.  The

22   first one is, most, if not all inventions, rely on building

23   blocks of prior art.  Most, if not all inventions, rely on

24   building blocks of prior art.

25               The question is not whether I can go through the

1    prior art and find a block here and a block there and

2    another one there and put them together to make the same

3    structure that is in the patent involved in this lawsuit.

4    That is not the question.

5              And another one of the directions that His Honor

6    gave you goes directly, it is very relevant to this point.

7    It talks about hindsight.  It talks about how one goes about

8    this exercise of deciding:  Is this invention obvious?

9    Would it have been obvious?

10             It is very important here that what we have to

11   do is not look at this through the eyes of today.  We have

12   to rewind the clock and go back and think, how would the

13   world have looked to someone there at the time.  And, again,

14   as the instruction says, it is wrong to use the '371 and

15   '969 patents as a guide through the maze of prior art

16   references to combine the right references in the right way

17   so as to achieve the results of the asserted claims.  You

18   cannot take these to guide you through the maze of the prior

19   art.  It's as though these do not exist and you have to look

20   at the maze without them.  You must put your mind back to at

21   the time of the invention and what one of ordinary skill

22   would have known then.

23             Let's keep that in mind.  What would one of

24   ordinary skill have known then and what was the evidence

25   that we heard on that?

1          Well, I submit, ladies and gentlemen, we didn't

2     hear very much at all about that from Dr. Forys.  What he

3     said was I found this piece here and I found that piece

4     there, and I can put them together and, well, we have the

5     invention.

6          What we did hear about rewinding the clock and

7     going back and what did the world look like in those days,

8     we did hear about that from Mr. Lanning.  Remember, he

9     explained, he said, these were like cell phones, they were

10    like bricks, they had tiny screens on them.  That's the way

11    the world was in those days.

12         And many things that look very obvious to us now

13    were not at all obvious then.

14         And remember, he talked about one of these items

15    of prior art, Owensby, the Owensby patent, where cell phone

16    calls, were very, very expensive and one way you could

17    reduce the cost was to sign up for ads, you could fill out a

18    form, you could go to the phone, and you could say, yes, get

19    me ads.  When you would made a call, before you could even

20    get on the call an ad would be played to you.

21         That is one of the things that the defendant in

22    this case says that makes the invention obvious.  Mr.

23    Lanning went through that.  He said you can't stitch those

24    pieces together.  It is not at all the same as targeted

25    advertising.

1          So let's take out the patents where there is

2   just an obviousness argument that is that has been made.

3          What are we left with?  What is the only patent

4   here?  There is just one patent as to which Dr. Forys said,

5   well, this is the same invention, same invention.  And it is

6   this Armstrong patent.  And he said, well, Armstrong is the

7   same as, it's absolutely identical to what is claimed in the

8   claims of the '969 patent or the targeted advertising patent

9   as we have called it sometimes.

10          Let's look at that.  Let's examine that.  Is it

11   the same?

12          Let's go to the next slide.

13          That top box there is what Armstrong says.  That

14   is one of the pieces that we focused on.  This is the part

15   of it that is supposedly dealing with targeted third-party

16   advertising, supposedly.  And it says you can have a message

17   there customized for each cellular carrier.  Customized for

18   each cellular carrier.

19          Do you recall, we asked Dr. Forys, what is a

20   cellular carrier?  And he told us, it's Verizon or AT&T or

21   T-Mobile.  It's a phone company.  And what is going on in

22   this patent is simply saying we can put in a message that

23   tells you what phone company is handling your call.  That's

24   all.  That's not targeted.  It's not anything about the

25   caller.  It is not individual to you.  It's always the same.

1    It's just what phone company is carrying that call.

2                Dr. Forys also said, well, I think this is

3    important because the Armstrong patent was not considered by

4    the Patent Office when it decided to grant this patent,

5    Exhibit 1, the '969 patent or the targeted advertising

6    patent.  He said Armstrong wasn't available to the patent

7    examiner.  It is certainly true that the Armstrong patent

8    itself was not there in front of the patent examiner.  But

9    the information in the Armstrong patent was something

10   exactly the same there.  Look in the lower box what we have

11   here.

12               This is a quotation from the patent in this

13   lawsuit, from Mr. Pines and Ms. Baumeister's patent.  And it

14   starts out by saying, look, talking to the world at large,

15   including the Patent Office, saying, we have made an

16   invention.  And our invention is better than the things that

17   exist right now.  And why do we say that?  Let's look at

18   what exists right now.

19               This is what they said, here is the way things

20   are before our invention.  When you play a message, this is

21   what you get, we are connecting you to a number, "Thank you

22   for using "XYZ," where XYZ is the name of the service

23   provider.  Same thing as the cellular carrier:  "Thank you

24   for using AT&T."  "Thank you for using Verizon Wireless."

25   That information was in the Armstrong patent, it was already

absolutely available and nobody made any mystery of it.  Of course, that was the art.  That is what we are better than.  That is what the invention is an improvement over.

So Armstrong is not in any way a reference or a piece of prior art that is the same as the inventions of the patent in this case.

Let's go back to our timeline there, and we will put in the last X there.  None of these pieces of prior art, not a single one of them discloses the invention of the '969 patent or makes it obvious.

Let's do the same exercise for the second patent, the '371 patent.

Again, we were shown a timeline with a list of prior art references.  And again, when we got into this in a little more detail, it turned out that maybe all was not as it seemed at first.  Let's take out the ones -- these ones were never even mentioned.  Take out the ones not about directory assistance.  And what are we down to?  Again, we are again down to one single patent, one single patent that is alleged to have the same invention and therefore invalidate or anticipate the '371 or category listing patent.

Let's look at that piece of prior art.  Here is the slide that Dr. Forys put up to explain why in his view this was the same invention.  And he put in a list because

1    we had heard a lot of evidence, a lot of talk about lists in

2    the category listing patent.  And he showed you this list

3    here.

4              Then, you may recall cross-examination, he had

5    to admit, that list is not in the Paxson patent.  That was

6    something that Dr. Forys created for this slide.  That list

7    isn't in the prior art patent.

8              What is in the prior art patent is the drawing

9    above, that drawing.  And if you recall, Mr. Lanning talked

10   about that.  He described it.  He said it's like a dart

11   board.  Remember, this is the patent where I arrive at the

12   airport and I call 1-800-gettaxi.  And 1-800-gettaxi puts me

13   through to a taxi company.  And the way it does that is, it

14   looks at the dart board, throws a dart at the dart board,

15   wherever the dart lands, that's the taxi company that I am

16   being put through to.  There is no list, and there is no

17   suggestion.  One of the things that is required for the

18   category listing patent in this case is a suggestion.

19             Let's take a look, what did Paxson say?  He said

20   I make that call, here is what I hear.  The Garbo Cab

21   Company has been selected.  It doesn't offer me a choice.

22   It just says, this is the one I picked for you.

23             Again, to use Mr. Lanning's analogy, the

24   suggestion is like when I offer you a plate of cookies, and

25   I say you should try the oatmeal raisin.  It's real good.

1    What is going on here, it's not a plate of cookies, it's

2    saying, here, take an oatmeal raisin cookie.  You are being

3    given a cookie.

4              Why does that happen?  Well, suppose I arrive at

5    the airport, I have been through this airport before, and I

6    have had a bad experience with the Garbo Cab Company.  I

7    have been I have called before.  And you know what?  I ended

8    up waiting for an hour.  It never showed up.  I had to find

9    another way to get home.

10             With this system of the prior art, this Paxson

11   system, too bad for me.  I get what it decides to give me,

12   and I have no way to change that.  I can't make another

13   selection.  If I don't like it, I can hang up and try again.

14   And guess what, it might give me Garbo again.

15             That's not what the category listing patent is

16   about.  Remember at the beginning of the trial we were told

17   the category listing patent is like the Yellow Pages.  The

18   Yellow Pages isn't you look and get one choice.  You look

19   and make a choice.  This Paxson reference is nothing like

20   the category listing patent.  It doesn't anticipate it, and,

21   ladies and gentlemen, we submit you should reject that

22   argument.

23             So let's come back.  Let's put the last red X in

24   and there.  And before we leave the question of validity,

25   let's talk about the two patents in the lawsuit.

1            As the Court has instructed you, the patents are

2     entitled to a presumption of validity.  It is up to the

3     defendant, Jingle, to provide you with evidence that these

4     patents are invalid, and that evidence is a high amount of

5     evidence or higher than the other standard.  It's clear and

6     convincing evidence, which means it must produce in your

7     minds an abiding conviction that the truth of the facts

8     alleged is highly probable.

9            If you don't have that abiding conviction that

10    the truth of the matters alleged is highly probable, you

11    should reject the argument that the patents are invalid.

12           Let's move on and talk about infringement.  We

13    will start with the '969 or targeted advertising patent.

14    Here is Claim 1 of that patent, which, ladies and gentlemen,

15    I know you have seen a great many times in the past few

16    days.  There is an awful lot of words up there.  The only

17    thing that is in dispute here is what is highlighted in

18    yellow.  As to everything else, there is an agreement that

19    it is in the Jingle system.  So no matter how many slides

20    you may see that say Jingle does it differently, remember,

21    except for the closing prompt message, it is agreed, Jingle

22    does it the same.  Everything else, Jingle does it the same.

23           And the issue, ladies and gentlemen, that you

24    will have to decide is whether there is in the Jingle patent

25    something that is substantially equivalent to that closing

1    prompt message.

2              So let's talk about that, because that is the

3    one and only infringement issue for this patent in this

4    lawsuit.

5              We can't resolve that issue without looking at

6    the claim construction.  Let's look at Chief Judge Sleet's

7    claim construction.

8              The Court has gone through and told us what does

9    that term, closing prompt message, mean?  It means a message

10   provided to a calling party upon completion of the

11   information assistance call but prior to connecting to the

12   subscriber.

13             Let's focus on that.  Upon completion, that

14   message, to meet, literally meet this definition, must

15   happen after completion of the information assistance call.

16   That is what the Court has told us.  Now, that -- and that's

17   not negotiable.  That's not optional.  That's the law.

18   That's claim construction.

19             I want to talk for a moment about some of the

20   testimony that you have heard about the claim construction,

21   because I want to dispel any misunderstandings here.

22             There was some testimony about what our expert

23   witness, Mr. Jones, may or may not have thought about this.

24   Let me be very clear:  We didn't bring that up.  On the

25   direct examination, we didn't ask Mr. Jones any questions

1    about that.  It was on the cross-examination.

2              And yesterday, when Dr. Guerin was sitting here,

3    remember, he was asked, what do you think Mr. Jones thinks

4    about the claim construction?  Again, we didn't bring that

5    up and we don't think it's important.  We don't think it has

6    any place in answering the question that we are all here to

7    answer.  We think it's a sideshow.  We think it's a

8    distraction from the real question.

9              The question is this:  Does the Jingle system

10   have -- does the advertisement, the switch pitch

11   advertisement in the Jingle system, does that mean meet this

12   definition?  And I asked Mr. Jones that question, and he

13   came back and he said to me, there is a difference.  He

14   said, I think a small difference, in my opinion, but it is a

15   difference, there is a difference.  And in the Jingle

16   system, that advertisement is not played upon completion of

17   the information assistance call.  It is played before

18   completion of the information assistance call.  So it does

19   not literally meet this term of the patent.

20             And then our question doesn't end there.  Let's

21   just pause for a moment and define what it is, what is the

22   question that you ladies and gentlemen will have to answer?

23             We agree, it doesn't meet this literal

24   definition.  If it did meet the literal definition, we would

25   be asserting literal infringement.  But as you recall from

1   the instructions you were given, there are two kinds of

2   infringement.  There is literal infringement and there is

3   infringement under the doctrine of equivalents.

4           What we are asserting is infringement under the

5   doctrine of equivalents.  We are saying, even though the

6   advertisement in the Jingle system does not meet this

7   definition, is it nonetheless an equivalent.  And just on

8   that point, let me again comment on something that I think

9   may be a sideshow or distraction.

10          You have seen many slides showing Jingle's view

11  of the Jingle system, with a green zone and a red zone and a

12  picket fence.

13          We don't contend that the message is inside the

14  picket fence.  We don't contend that it is in the red zone.

15  Everyone agrees it is in the green zone.  The question to be

16  decided here is:  Is that an equivalent?  How do we answer

17  that question?  Again, the Court has given you ladies and

18  gentlemen guidance, the rules.  And the rules are, we look,

19  we apply certain legal tests.  There is one that is commonly

20  used and that we suggest would be the right way to answer

21  the question here, what is called the function, way, result

22  test.

23          We look at this part of the patent, the closing

24  prompt message, and we say, what is the function of that,

25  what is the way in which it achieves that function, and what

1    is the result.

2              Then we look at the switch pitch in the Jingle

3    system and we say, does it have substantially the same

4    function?  Does it do it in substantially the same way?  And

5    does it achieve substantially the same result?  If the

6    answer to those questions is yes, then, ladies and

7    gentlemen, there is an infringement.  There is an

8    infringement even though it does not fall within the literal

9    language of that definition.

10             I would like to look at some of the evidence

11   that we heard about function, way, and result.  Again, we

12   asked Mr. Jones:

13             Have you looked at that?

14             And he testified, in his opinion, this was his

15   opinion about what is the function, what is the way, what is

16   the result.  The function is to make use of the time in the

17   directory assistance call to play a targeted message.  The

18   way is to use information taken from the caller's request.

19   So in our example that you are probably heartily fed up

20   with, but in our example of Pizza Hut and Domino's, that is

21   to request the Pizza Hut and figure out, oh, this person is

22   interested in pizza.  And if I do that, by looking at a

23   database, it is dynamically selecting a message in realtime.

24   That means you could look in a huge database, and look at

25   thousands, tens of thousands, millions of phone numbers, and

1    pick out like that instantaneously the ones that may be

2    relevant here.  And the result is you play a targeted

3    advisement there.

4           Before we move on from this, I would like to

5    again make an observation, which I think is very important

6    here.  This is what Mr. Jones said.  And Dr. Guerin

7    testified that he disagreed about that.  But what he did not

8    do, ladies and gentlemen, was provide his own alternative to

9    this.  The only person who came into this courtroom and said

10   here is the function and here is the way and here is the

11   result was Mr. Jones.

12          You never heard from Jingle what they say is the

13   function, or what they say is the way, or what they say is

14   the result.

15          Now, why does this matter?  Why does it matter?

16          Why is it a big deal?

17          Here is what the patent says.  What the patent

18   says is this enables us, it allows us, it gives us the

19   ability to tailor the closing prompt to a particular caller,

20   increasing the advertising and related promotional revenue

21   capacity of the closing prompt feature.

22          And let's just dwell on that for a minute.  Why

23   is this a big deal?  Imagine that I am Domino's, and I just

24   opened a new restaurant, and there is a whole lot of other

25   pizza restaurants around and they are full of customers and

1    my new restaurant hasn't got much of anybody in it.  I am

2    not getting a lot of customers.  What I need to do is

3    advertise.  I need to get some of those people who go into

4    the other restaurants and have come to my restaurant.  How

5    am I going to do that?

6              Traditionally, I am going to advertise.  I

7    certainly am going to have my ad in the Yellow Pages.  I

8    might have other ads around.  What this invention says, the

9    inventors, they can go to Domino's and say, hey, I can put

10   you in touch with someone who has 20 bucks in their pocket

11   and is about to go out to Pizza Hut and buy a pizza, right

12   now.  Not someone who may have been in Pizza Hut six months

13   ago.  Not someone who does it from time to time.  But right

14   now, in the moment, that that person is interested in buying

15   the thing that you sell, I can allow you to play an ad to

16   him.  That is a very big, deal because if you are Domino's

17   or, for that matter, if you are the Quality Inn or whatever

18   kind of business you are, what you want is to be able to

19   talk to someone, a potential customer, who you know is

20   interested in what you sell, at the time when they want to

21   make a personal decision, when they want to buy what you

22   sell.  If you can get through to that person at that time,

23   your chances of making a sale are many, many, many times

24   higher than if you just put an ad in the Yellow Pages.

25              That is what this delivers.  That is why people

look to this and said it's a really big deal.  In the words

of the patent, what it enables one to do is allow for

targeted third-party advertising.

Now, I want to look at why it is that we, Grape,

think that the switch pitch has the same function and way

and result as the closing prompt message.  But before I do

that I would like to refresh our recollections.

I would like to replay for you, ladies and

gentlemen, the recording that we heard of that message, just

so it is fresh in everyone's mind.

All right, first we will play all of that

message, just so it's fresh in everybody's mind.

"The Operator:  What city and state or say

(inaudible)?

"New York City, New York.

"New York City, New York.  Say the name or the

type of business.

"Waldorf Astoria Hotel.

"The Waldorf Astoria and Towers.  If that's not

right, say go back.

"I'm showing two locations for that.  The first

is on 301 Park Avenue and the second is on Cocktail Terrace.

Which would you like, the first or the second?

"The first.

"No. 1, the Waldorf Astoria and Towers on 301

1    Park Avenue.

2              "While I search, a word from our sponsor.

3              "Did you know some Days Inn Hotels offer

4    expanded business class amenities and will conveniently

5    accommodate your next group meeting or event, all at an

6    affordable Days Inn rate?  Save ten percent off our best

7    available rate when you request promo code LRO.  To speak

8    with a Days Inn representative, press the star key now.

9              "I have found the number.  I also have the

10   number for Days Inn, who also may be able to help you, and I

11   can connect you free of charge.  Your number is

12   212-872-4800.  To be connected to Days Inn, press star,

13   press pound.  You can also say connect me, address, you can

14   also say connect me, address, repeat number, or press star

15   to speak to Days Inn.  Connect me.  Your call is being

16   connected."

17             Ladies and gentlemen, that was a Switch Pitch.

18   You call up for a hotel in New York City and it gives you

19   the number for Days Inn and other hotels in New York City.

20             What does jingle say about the Switch Pitch?

21             There is what it says.  It says it is a highly

22   targeted competitive offer played in response to a specific

23   lineup request intended to get the caller to switch and

24   connect through to the advertiser.

25             Why do we say it has the same function, way,

1    result?  Again, it is playing a message, an advertisement,

2    that is highly targeted, a competitive offer.  You are

3    picking out someone who is a competitor to the person who

4    has been there before.  The way that is being done is by

5    looking up in a database, on the fly, there and then, you

6    ask for one hotel in New York City, what other hotels.  I

7    have got one.  I will play that for you.  The purpose is to

8    try to get you to go to the advertising instead of the

9    business whose number the caller was looking for.  And

10   ultimately the result of that is that you can sell an ad,

11   you can increase the revenue from the advertising on the

12   Jingle system.

13            In other words, it has the same function, it has

14   the same way, and it has the same result.

15            Now, this invention, this aspect of this

16   invention is about targeted and not timing.

17            Why do I say that?  Well, again, what is Jingle

18   saying in reaction to this?  They are not saying that is

19   great, you have invented a new place to play a directory

20   assistance call.  They are not saying that's great, you have

21   invented a way to target my ad to the exact people I want my

22   ad to go to.

23            The key to this, in our view, ladies and

24   gentlemen of the jury is targeting, not timing.  And if we

25   go on, and we look then back to the claim chart, remember,

1  that was the only element, the closing prompt message was

2  the only single thing about which there was any debate.

3  Everyone agrees that every other part of that claim is

4  present in the Jingle system.

5          For the reasons that I have just gone through,

6  ladies and gentlemen, in our submission, it is very, very

7  clear that the closing prompt message -- that the Switch

8  Pitch is an equivalent to the closing prompt message of this

9  patent because its has the same function, substantially,

10  substantially the same way, and substantially the same

11  result.  And therefore, you should find infringement of

12  Claim 1.

13          Let's quickly look at the other claims here.

14  Claim 5, what does this bring to the party?  Automation.

15  Can automatically retrieve something?  Again, undisputed

16  evidence that the patent covers automation.  There is no

17  doubt about that.

18          As to this claim, if you find infringement of

19  Claim 1, no doubt that you should also find infringement of

20  Claim 5.

21          Claim 20, here, a closing prompt storage module.

22  Same thing.  No one is arguing over this.  If you find

23  infringement of Claim 1, you should find infringement of

24  this claim.

25          The last claim, looking at some of the

1    information that is used to pick out that targeted ad, here

2    is a variety of things.  One is something called NPA/nxxx of

3    the destination number.  That is a part.  It is the Area

4    Code and the middle three digits of the number.  And again,

5    no doubt, no dispute, that that is exactly how the Jingle

6    system works.

7              So this is present in all of these claims,

8    ladies and gentlemen.

9              What we urge you to find and what we think the

10   evidence shows is that Jingle doesn't do it differently.

11   Jingle does it the same.

12             So with that, let us move on to the second

13   patent, the category listing patent.  And again, here is the

14   claim, or the independent claim of this patent.  And once

15   again, as to most of these elements, most of these parts of

16   the claim, there is no dispute.  Everyone agrees, except for

17   the things that are highlighted in yellow, everyone

18   agrees -- well, I don't wish to misspeak.  I think actually

19   there is likely a dispute as well about this part,

20   suggesting.  These parts of the claim, everyone agrees,

21   every element there is in the Jingle system.

22             What are the arguments by Jingle as to why it

23   does not infringe?

24             This patent is about a list.  One of the things

25   Jingle says is that, well, if I take this list, I have a

1    list, let's say it's a list that it meets the requirements

2    of the patent.  If I put on the bottom of that list some

3    more businesses that don't pay anything to be on the list,

4    now I am out from under, now I don't infringe.  That is

5    their argument, their first argument.  We talked about that.

6           It may be easiest to look at this in a graphical

7    way.  Ladies and gentlemen, you may remember this diagram

8    that there was testimony about.  Here, the argument is made,

9    here is our list and these are the people who pay.  We have

10   shown it with the green bracket.  Now we have at the bottom

11   some additional people shown with the red bracket.  And they

12   don't pay.  The argument is made, because we have people in

13   the list who don't pay, then we are outside the scope of the

14   patent.  So the question to resolve here is, is that right

15   or wrong?

16          And I suggest, ladies and gentlemen, that this

17   is an easy one, because we don't have to go far to answer

18   this question.  We only have to go to Claim 7.  You just

19   have to drop down a little further in the patent and look at

20   Claim 7 in the patent and that tells us the answer, because

21   Claim 7 says the patent covers businesses which have given

22   compensation in the same list.  It says these ones are

23   listed before these ones.  It is exactly what we are saying,

24   it is saying precisely this, the green ones are in the list

25   and the red ones are in the, list but the green ones are

1    first.  That one should not require too much debate.

2              Let's go on.  What is the second argument for

3    why there is no infringement here?  What is the second

4    argument by the defendants as to why there is no

5    infringement?

6              That one centers on the words compensation

7    given.  Compensation given.  What the defendant says is,

8    well, that's in the past tense, given.  I don't actually get

9    paid until later, in the future.  So because it says given,

10   not to be given, I don't infringe.  That's the argument.

11   You may recall, there was some questions to Mr. Jones about,

12   well, given is the past tense, isn't it?  And he said maybe

13   it's the past participle and there was a little

14   back-and-forth about the grammar.  I suggest we did not need

15   to get into the grammar here, because this is another one

16   where there is a claim construction.  And in this instance,

17   it's not a claim construction that Chief Judge Sleet has

18   given us.  It is a claim construction that the two sides got

19   together and agreed upon and said this is what that term

20   means.  Compensation given means payment, payment.

21             There is no time element in payment.  When you

22   talk about a payment it doesn't tell me whether it happened

23   yesterday, today or tomorrow.

24             Me and my colleagues, we are hoping to receive

25   payment for our services here today.  We haven't gotten it

1    yet.  And it doesn't matter when the payment is.  Just as

2    Mr. Jones and other people testified, payment is in the

3    normally course of.  Like when you buy something and get a

4    bill later on, you charge something on your credit card and

5    send a check later on, there is payment involved.  And you

6    start a new job, you don't get paid for the first two weeks,

7    you are not cashing it in.  You are still receiving payment

8    for your services.  This again we think should be pretty

9    straightforward.  In fact, we believe the patent actually

10   has some guidance on this.

11            Here is one of the things that the patent says,

12   you heard some testimony about this.

13            Businesses can bid to be listed at the beginning

14   of the list.  "Bid."  Well, bid, what's a bid?  Think about

15   an auction.  You go to an auction.  There is something I am

16   interested in.  I raise my hand.  Auctioneer nods at me.  I

17   have made a bid.  But someone else likes it, too.  That

18   person bids.  He or she has made a bid.  I haven't paid for

19   it.  And, in fact, unless my bid is the highest bid I won't

20   ever pay for it.  But that's still very much within the

21   contemplation of this invention.

22            And, again, let's look at how Jingle does it,

23   not how the slides say Jingle does it but how Jingle's own

24   internal documents say Jingle does it.

25            Look at that.  Order will be determined based on

1    who agrees to pay the most.

2              That's not difficult to understand.  The person

3    who agrees to pay the most will be put at the top of the

4    list.  That's how Jingle does it.

5              Let's go back.  In our submission, ladies and

6    gentlemen, every element of Claim 4 of the category listing

7    patent is met.  When we go on to the other claims, every

8    element of Claim 5.  Here, we have got again the list with

9    the people who paid and the people who didn't.  This time it

10   is the order in which they are suggested.  But the same

11   thing, I don't think there is much dispute about this.  Here

12   is the one we looked at before, the order in which they are

13   listed.  Again, you heard explanation of that.  No doubt,

14   that is met.

15             And finally, the last claim, where this further

16   adds connecting the caller.  And we have heard that, we have

17   heard some of the sound, the recordings that have been

18   played and so on that show that.

19             So let us then move on past infringement and

20   turn to damages.

21             And we looked at this at the beginning of the

22   trial.  Let's just put these up there.

23             In our submission, ladies and gentlemen, the way

24   we view the world, we have to go back to that hypothetical

25   negotiation which would have happened in 2006 or 2007,

depending on the patent.  And we have to look at, well, what

would the parties have agreed to?  If they sat down across

the table, what bargain would they have struck, knowing that

the patents have valid and infringed?

So there is no mystery or doubt.  They have to

reach an agreement.  How would they have negotiated and what

would they have come to?

Ladies and gentlemen, in our view, these are the

three most important factors.  We have heard extensive

testimony and His Honor just read the various factors that

can be considered here.  There are many of them.  In our

view, ladies and gentlemen of the jury, these are the three

that are going to really matter here.

The inventions are core to Jingle's business.

You know, we will look at that in a moment.

Jingle, at the time of the negotiation, Jingle

expected to achieve enormous revenue.  Now, they didn't.

That didn't actually happen.  But at the time of the

negotiation they expected that.

And Jingle will take business away from Grape.

So let's look at those, let's review them.

There is just one sample of the various things we saw.  At

the time of the negotiation, Jingle thought it was going to

make a killing with this.  They thought there was quite a

pot of gold to be had here.  Why does that matter?  Because

1    if you think by getting a license I am going to be able to

2    tap into that pot of gold, you are then willing to pay a

3    good deal more for the license.  So in our view, that is a

4    factor that should weigh heavily and be considered here.

5           Now, I said that the inventions are a core piece

6    of Jingle's business.  There we see one example.  This is

7    just an example of the types of documents that we looked at.

8    There we see Switch Pitch ads are a core piece of Jingle

9    Networks advertising solution.

10          So again, their own documents say that.

11          Competition.  We heard a lot of evidence about

12   this.  But we heard evidence that there had been competition

13   for the Boost contract and the Tracfone contract and the

14   Sprint contract, and that, in fact, there might be

15   competition going on right now even as we speak for that

16   Sprint contract.

17          So what does Jingle say about these factors?  It

18   says, you shouldn't look at the fact that we expected to

19   make a whole lot of money back in 2006 and 2007 because

20   things didn't work out that way, that didn't actually

21   happen.  And there is something called the Book of Wisdom

22   that means I can look forward and know what's actually going

23   to happen, and that's fair enough.  No problem with that.

24          But then, when we look at the competition part

25   of that, Jingle says, well, you shouldn't really put much

1    weight on competition, because if you go back to the way

2    things were in 2006, two companies were working together, we

3    weren't competing, we are not really competitors.  Again,

4    our view, ladies and gentlemen, is it doesn't matter what

5    the rules are, but the rules have to be the same for both

6    sides.  You can't pick some facts from back in the day

7    because you like those ones and some facts right now and

8    again mix and match.  You take everything or take nothing.

9            You take everything, you look at what is going

10   on here.  What is going on right now is competition.  You

11   heard a lot of testimony about the effects of that, what

12   would happen if Grape lost that Sprint contract, 40 or 50

13   million dollars in business, you have to throw people out of

14   work.  Of course, they are not going to want to give away a

15   license for pennies on the dollar.  They are going to want a

16   lot of money.  That is going to be their position going into

17   the negotiation.  And Jingle is going to say, no, you are

18   asking too much.  And they are going to meet somewhere.

19   They are going to meet in the middle.  But the middle is

20   going to be pretty high, because Grape is going to start off

21   real high under these circumstances.

22           And I suggest, ladies and gentlemen, that the

23   testimony that you heard -- look very carefully at the

24   testimony about competition.  Think very carefully about

25   that.  There is no dispute that Sprint went out and said, we

1    would like to hear from everyone who might be interested in

2    having our business and we would like for them all to give

3    us a quotation on that, and that nine companies did that,

4    and Sprint looked at the various quotations and it whittled

5    them down to four, a final four, as I have said.  And where

6    we are right now is Sprint is looking at deciding which of

7    those final four to pick.  One of them is Grape.  One of

8    them is Jingle.  Remember the Jingle witnesses said, we

9    don't think we are in competition.  That's not competition.

10   If that's not competition, what is?

11              When two companies are going to the same

12   customer saying, please give me as much of your business as

13   you will, don't give it to the others, if that's not

14   competition, what is?

15              Now, what's the royalty rate, what's the royalty

16   rate?

17              Here is what Mr. Tate suggested to you.  What do

18   we want?  Eight percent.  That's 8 cents on the dollar.  For

19   every dollar that comes in the door they get to keep92

20   cents, to use patented technology that in their own

21   documents they say is the core to their business.

22              Ladies and gentlemen, we suggest that that is

23   not an unreasonable split, 92 for you and eight for me.

24              And that's how the numbers worked out, as Mr.

25   Tate gave them to you, for the category listing patent, you

apply the 8 percent royalty, 589, 590 thousand dollars, more

or less.  For the targeted advertising patent, 8-percent

royalty, $1,541,000, total, $1,541,213.

Again, we suggest, ladies and gentlemen, not a

lot of money for technology that you say is the core to your

business.

Finally, I would like to just look at the

history again here, the history.  We saw this earlier I

think in the opening.  Remember, we heard about the history

of Grape, how Mr. Pines quit a good job on Wall Street and

with his partner got in the car and drove 16 hours to

Atlanta to see whether their idea would work.  And they set

up shop in that truck garage.  They had the phone line

running the bannisters and worked real hard to develop new

technology.  They built a business.  And over the years,

they applied for patents.  And at this point, at the end of

the day, they have over 8,000 employees and over 70 patents.

And Jingle, well, Jingle showed up later, 2005,

and very soon began using the Switch Pitch ad.  And in 2007

they began using the category listing ad.  And you have

heard some suggestions about why this lawsuit was brought

and so on.  You might hear some more.

The reason this lawsuit was brought was to

protect the intellectual property.  This company is built on

intellectual property.  As we heard, the consequences of

1    losing that business could be very dramatic.

2            We fully understand.  Mr. Kliger from Jingle

3    started his own company.  And he has his dream.  That is

4    fine.  There is absolutely nothing wrong with that.  He has

5    looked at Mr. Pines, and he would like to be able to do the

6    same thing, to build a company and make it a succeed.  And

7    how can you fault him?  There is absolutely nothing wrong

8    with that.  Nothing.

9            But what he can't do is build that company on

10   someone else's technology -- that's just not okay, the

11   reason we have patents is to protect technology, so that

12   it's possible to make a new invention and have an exclusive

13   right and use that exclusive right -- and your competitor

14   comes in and gives the same thing to your customer and build

15   your business on that.  That is why our patent system exists

16   look.

17           We have shown you that these two patents are

18   valid and infringed and we would very much, very

19   respectfully, ask for your verdict to that effect.

20               Thank you, ladies and gentlemen.

21               THE COURT:  Thank you, Mr. Groombridge.

22               Mr. Sabharwal.

23               MR. SABHARWAL:  Thank you, Your Honor.

24               Your Honor, may I move this just a bit?

25               Good afternoon.

1        Ladies and gentlemen, the first thing I want to

2   do is thank you for being so attentive during this entire

3   period.  We understand it's the holiday season and you

4   probably have a lot of things to do.  You have been very,

5   very attentive throughout the entire time.  I have noticed

6   you have been taking a lot of notes.

7        You know, there has been a lot of information

8   thrown at you.  We have thrown technical information,

9   infringement, invalidity, damages, competition, all sorts of

10  things.  And the thing is that, you know, what you may not

11  understand is we have been fighting these guys off for two

12  years.  And during the course of those two years, we have

13  had to review hundreds of thousands of documents and taken

14  all sorts of depositions and filed motions with the Court

15  and done all sorts of things.  We have had to spend a lot of

16  time looking at all that information.  And you have only had

17  six days to really basically be thrown into this.

18       What I would like to do is what I said about a

19  week ago, I think it was a week ago.  I want to try and

20  simplify this for you.  I want to really try and talk to you

21  about what the core issues are in this case.

22       Let's go through them.

23       First of all, you have seen a number of people

24  from our team standing up and asking questions and you may

25  be wondering, what's going on there.  Let me see if I can

1  summarize it.  There is three issues in the case.  One of

2  them is infringement.  You saw me stand up and speak with

3  Dr. Guerin again yesterday, Roch Guerin.  He was talking to

4  you about why Jingle does not infringe the two patents, the

5  '371 and the '969 patent.  Then you saw me on Friday

6  cross-examine Mr. Jones.  There was some very, very

7  significant revelations that Mr. Groombridge brought up when

8  I started cross-examining him.  The truth came out about a

9  lot of things in terms of the basis for his opinions.

10            Then after that you saw Mr. Evens and Mr.

11  Banowit.

12            (Addressing people at counsel table)

13            Just raise your hands real quick.  These two

14  handled the damages.

15            So you saw them talking to Mr. Barry and Mr.

16  Tate, the damages experts.  And you heard from Mr. Barry

17  that, you know, in the unlikely event that you elect to deem

18  us to be an infringer, that the damages are actually very

19  low in this case.  And Mr. Barry gave you testimony about

20  that.

21            Then finally you heard from Ms. Gordon and Mr.

22  Sokohl.  They were dealing with the invalidity issues.  You

23  heard Dr. Lynn Forys.  Dr. Forys is a man with 35 years of

24  experience in the directory assistance market, a man who

25  reviewed hundreds and hundreds of references before he

1     showed you references that had not been in front of the

2     Patent Office.  He showed those to you.  And he showed you

3     how those references, each element of those references is

4     found in the patents.  And we are going to go through that

5     in a little bit of detail.

6               But again, you know, at the end of the day,

7     after all the evidence, testimony, documents, exhibits,

8     everything else, it still comes down to the three things

9     that I talked to you about last week:  common sense, plain

10    understanding of English, and the evidence we showed you.

11              What do I mean by common sense?

12              I told you last week, we are going to be

13    fighting about the word given.  I was corrected on the

14    stand.  It's not the past, it's the past participle.  It

15    doesn't matter.  Given is something we do in the past.

16              We have been fighting about the word closing.

17    Closing means closing.  Closing means something you do at

18    the end.  It's very simple.  But nevertheless, we have been

19    fighting about that.

20              So what I want to do is, let's put those skills

21    that we talked about to work.  Let's start with the why.

22    You have seen all the evidence.  You have seen all the

23    testimony.  You heard the witnesses.  Why are we really

24    here?  Why have we been here for day after day arguing,

25    presenting evidence to you?  Why are we really here?  It's

1    very simple.

2            The evidence has shown that KGB wants to get rid

3    of free directory assistance.  And Jingle, well, Jingle is

4    their target.  That's why we are here.  You have heard Mr.

5    Pines and Ms. Baumeister complaining to you about the fact

6    that it's so unfortunate that Jingle competes with them, and

7    it's just so unfair that they have to actually compete with

8    a company that wants to offer a better product, a company

9    that wants to offer free directory assistance.  So they said

10   to you, you shouldn't allow them to do that.  You shouldn't

11   allow them to give carriers and customers free directory

12   assistance because then we don't make any money.  We don't

13   make any money.  And you heard Mr. Pines talk about, you

14   know, every time a customer makes $1.50, I only get paid 30

15   cents.  Well, you know what?  You heard Mr. Groombridge show

16   you again, one billion calls were answered by KGB.  I did a

17   little math.  One billion times .30 per call is 300 million

18   dollars going to KGB.  But that's just not enough for KGB.

19           Ladies and gentlemen, this is not about trying

20   to compete with Jingle.  This is about trying to get rid of

21   an option for the consumers.  And that option is free

22   directory assistance.  They don't want the consumers to get

23   it.  And they certainly don't want the phone companies to

24   get it.  And that is why we are here.

25           It is interesting.  It is interesting, the

1    timing of this whole thing, that you are sitting before us

2    when these two companies are competing to get Sprint,

3    because this is kind of déjà vu for KGB.  You see, you heard

4    testimony during cross-examination that when KGB was -- when

5    the shoe was on the other foot and KGB was being sued for

6    patent infringement, you heard Mr. Pines say, well, Metro

7    One sued us and Sprint went with Metro One because it was

8    the safer option.  They wanted to go with the company that

9    had not been sued for patent infringement.  Aha.  Idea.  So

10   now, where are we today?

11          Jingle has now been sued for patent

12   infringement.  And now KGB is the one sued.  And you have

13   heard testimony from both sides that Sprint is holding off

14   making a decision.  Maybe Mr. Pines learned something.  You

15   sue your competitor for patent infringement.  Maybe the

16   phone companies will be very, very reluctant to work with

17   you.  It is a very interesting coincidence, though, isn't

18   it?

19          Ladies and gentlemen, these two patents, they

20   are just excuses.  They are just excuses to sue us, to bring

21   us into Court, to force Jingle to spend millions of dollars

22   defending itself.

23          You know what?  If you look back at the

24   testimony, Mr. Groombridge said that this is about

25   protecting intellectual property.  Really, how much

testimony have we heard from them about protecting

intellectual property, protecting their patents?  They don't

even want to call the closing prompt patent the closing

prompt patent.  They want to call it targeted advertising.

The word "closing prompt" appears in their patent 200-plus

times, but they don't want you to call it that.  They want

you to call it something else.

          You can call it the light bulb patent as far as

I am concerned.  Still the claim is a closing prompt

message.  That is the bottom line, and that's what we don't

have.  And we are going to see that.

          Okay.  Let's just talk about the witnesses.  How

many witnesses did KGB have in their case-in-chief?  They

had Mr. Pines, Mr. Albus, Mr. Tate, their damages expert,

Ms. Baumeister, and Mr. Jones.

          How many of those people talked in detail about

the closing prompt message?  Only Mr. Jones.  How many of

those people talked in detail about the '371 patent?  Only

Mr. Jones.  The others were talking about the damages issues

and what would happen if you let a free directory assistance

service compete with them because they want to continue to

offer a paid service.

          If this was really about patent infringement,

don't you think they would have been putting in front of you

the patents and talking about the claims and talking about

1    how we infringe?  They didn't do that.  They wanted to call

2    it something else.  They wanted to talk about targeted

3    advertising or whatever.  They didn't want to talk about

4    what it is.  It is the closing prompt patent.  It is the

5    paid for listing patent.

6            What did we do, on the other hand?  The very

7    first thing I said to you last week, I said this case

8    involves three issues, three claim terms.  We are going to

9    see them again.  The claim terms are select a businesses,

10   given, and closing prompt.  What I am going to do today, I

11   am going to do the same thing.  I am going to talk about

12   selected businesses.  We are going to talk about

13   compensation given.  And we are going to talk about closing

14   prompt.

15           Does that look familiar to you?  You know why?

16   Because that's what this case is about.  This apparently is

17   why we have been brought into court.  We have been brought

18   into court because we apparently infringe this.  And last

19   week I talked to you about this, and these are the things

20   that we are going to talk about today.

21           I am not going to sit here and go through all

22   the evidence again because you have heard enough about pizza

23   and you have heard enough about all this other stuff.  I

24   want to briefly summarize it because I think the points are

25   pretty clear in terms of our infringement.

1          Let's talk about the '371 patent first.

2          Okay.  So Claim 4 of the '371, this may be

3     pretty familiar to you because yesterday Dr. Guerin talked

4     to you about this.  Remember what the Judge said, only the

5     claims of a patent can be infringed.  I am not going to take

6     you through this because Dr. Guerin already did.  I just

7     want to talk about this one phrase here because this is what

8     the parties fought about, ladies and gentlemen.  You see

9     this, selected businesses are ordered as a function of at

10    least compensation given to the directory assistance

11    provider for the bet selected businesses.

12          Look, this patent is basically, it's about paid

13    for listing.  It is a Yellow Pages patent.  You pay to get

14    listed.  You heard Mr. Kliger say again and again and again,

15    he said, let me be clear, he said we don't get paid to list

16    companies in our directory.  That is the bottom line.  And

17    there has been no evidence to show that we don't.  Instead,

18    we had a play on words.  We have had, well, compensation

19    could be compensation to be given.  It could be this.  Just

20    look at what the language says.  We get paid to be

21    connected.  Do you see the word connected anywhere?

22    Anywhere here?  No.

23          They want to put a square peg into a round hole.

24    Why?  Because they just want to bring us into Court.  We do

25    not infringe.  They are claiming that we literally meet

1    every one of these elements, literal infringement.  You just

2    heard Judge Sleet talk about the difference.

3              We don't this.  It's very clear.

4              Mr. Groombridge also said, he showed you

5    something and said, bid.  Oh, you see, it says bid,

6    therefore, they infringe.  I will tell you what, let's see,

7    does this claim talk about bid anywhere?  No.  The word bid

8    is not there.

9              The selected businesses pay up front to be

10   listed.  And that is the bottom line.

11             Now, if you remember, Dr. Guerin showed you

12   yesterday, again with the pizza thing -- I am just going to

13   summarize this -- that if you just summarize what the

14   concept is that we are fighting about, it's basically this.

15   All companies pay for listing.  As you can see there,

16   companies pay in advance for listing.  That's what happens.

17   We don't do that.  There has been no testimony.  In fact, I

18   am going to show you a slide of everything that Mr. Jones

19   admitted about this.

20             And Dr. Guerin also showed you that -- and I am

21   just going to run through this quickly, ladies and

22   gentlemen, because I know you have seen it -- he showed you

23   that there has been no evidence that we require anybody to

24   give compensation to be listed.

25             You heard Mr. Kliger say it again and again.

1     It's very simple.  You don't need to come from MIT, you

2     don't need to have a computer science degree.  You don't

3     need to have a law degree.  You just need to understand

4     English and use your common sense.  And that's the bottom

5     line.

6             Okay.  I am not going to run through this too

7     much more because I think Dr. Guerin already did that.  Let

8     me just take you to the last slide, because I think that's

9     important.  You see that company up there?  Again, Grotto

10    Pizza.  Guess what?  As Mr. Kliger told you, as Dr. Guerin

11    told you, the only company that has to pay is the company

12    that's connected.  You know why?  Because as Dr. Guerin told

13    you, when a company is connected, a connection record is

14    generated.  When a connection record is generated, an

15    invoice is generated.  And that's the company that pays.

16    And by the way, that's the only company that pays.

17            There has been no testimony to anything other

18    than that.  Guess what?  We asked, during cross-examination,

19    by the way -- if you noticed, during cross-examination,

20    that's when we get a chance to ask them questions about what

21    they said previously.  So if you recall, I was asking Mr.

22    Jones, didn't you testify previously about this and that?

23    Well, Mr. Jones had been deposed in this case.  I told you

24    that there was a lot going on before we actually got here.

25    Mr. Jones had been deposed in this case.  And Mr. Jones,

1       during that testimony raised his right hand, and he swore to

2       tell the truth, the whole truth, and nothing but the truth.

3       And during that, those were the questions I was asking:

4       Didn't you say this?  Didn't you say that?  And this is what

5       Mr. Jones admitted.  He admitted that the word selected

6       businesses means multiple businesses.

7               He admitted that in the Jingle system, at most,

8       one business would pay for a connection.

9               He admitted that given means in the past.  That

10      should say past participle.

11              He admitted that the interpretation of

12      compensation given is not spelled out in the patent.

13              And you know that Mr. Groombridge brought this

14      up.  He said, well, the parties had already agreed to this

15      particular term compensation given.  You know who didn't

16      know that?  Their expert.  He didn't know that.  At the time

17      that he submitted an expert report, he did not do his

18      homework.  He did not know that.  I asked him on the stand.

19      Did you know that?  Didn't you admit that you didn't even

20      know that?  He said, Yeah, I didn't know that.  But

21      nevertheless that didn't stop him from saying we infringe.

22      But he didn't know that.  Critical fact.

23              And finally, I asked him, Are you aware of

24      Jingle being paid by any advertiser prior to listing?  He

25      said, No, I am not.

1           He admitted all these things.  This is the only

2   person that talked about it, ladies and gentlemen.  There is

3   no evidence and no testimony that we do it the way the

4   patent requires.  Therefore, we ask you to do the following,

5   because this claim limitation of literal infringement is not

6   met, there is no literal infringement here.  You heard Dr.

7   Guerin talk about it.  There is just no literal

8   infringement.  They can try as hard as they want, there is

9   no literal infringement.

10          Now, Dr. Guerin also talked to you about the

11  dependent claims.  Well, I have got good news for you.  If

12  you find that we don't infringe Claim 4, we don't infringe

13  these claims automatically, as Dr. Guerin told you, because

14  all of these claims require everything in this claim.

15          If everything in this claim is not in these,

16  then we don't thing these.  So if you say we don't infringe

17  Claim 4, then 5, 7 and 8 we don't infringe automatically.

18  And we have actually got the verdict form here to show you.

19          So you are going to have this verdict form.

20  Judge Sleet talked to you about it.  The first question that

21  will be asked, has Grape proven by a preponderance of the

22  evidence that Jingle's reasonable royalty directory

23  assistance literally infringes the following claims of U.S.

24  Patent No. 6,775,371.  We ask you to click four checks

25  there.  The first one, if you check 4, that we don't

1   infringe, we don't infringe the others automatically.  You

2   are done with this patent.

3           So let's move on to the next one.

4           The next patent is the '969 patent.  I am not

5   going to call it the targeted advertising patent because it

6   is not the targeted advertising patent.  It is the '969

7   patent, and it talks about the closing prompt.

8           Okay.  You don't have to worry about any other

9   claim term.  Mr. Groombridge is right.  The term that we are

10  fighting about is the closing prompt message.  That is the

11  only term you need to worry about.  They have already

12  admitted that we don't meet that literally.  So the question

13  is, do we have it under this thing called the doctrine of

14  equivalents.

15          What I would like to do is step through the

16  figures, starting with Slide 15.

17          Can we get Slide 15 up, please.

18          All right.  Again, we are starting with the

19  claim.  And we go to the claim, and again, we both agree

20  that it is the closing prompt message.  This is the critical

21  claim term, the closing prompt message, either we have it or

22  we don't under the doctrine of equivalents.  I am going to

23  take you through that.

24          Now, again, the only person who provided

25  testimony that we infringed was Mr. Jones.  He provided

1    testimony about this.  It's their burden to prove

2    infringement.  Well, as Mr. Groombridge told you now, the

3    Judge has already defined this and it's the last page in

4    your jury instructions in terms of closing prompt message.

5    Closing prompt message is construed to mean a message

6    provided to a calling party upon completion of the

7    information assistance call but prior to connecting to the

8    subscriber.

9         Well, Mr. Groombridge said that we brought up

10   the fact that Mr. Jones had said the Court's claim

11   construction is ambiguous.  It is a critical fact.  During

12   the direct, if you recall, there was no mention of the fact

13   that Mr. Jones didn't understand the Court's claim

14   construction.  But for whatever reason, he didn't have any

15   problem accusing us of infringement.  He said, you infringe.

16   You infringe.  I followed the Court's claim construction,

17   and you have a closing prompt message.

18        And then I got up.  And I said, sir, isn't it

19   true that two weeks ago, when you raised your right hand and

20   swore to tell the truth, you actually said that the Court's

21   claim construction was ambiguous?  And he said yes.  And I

22   said, You actually said that both parts of the Court's claim

23   construction are ambiguous?  And he said yes.  And you

24   actually said that you didn't understand the Court's claim

25   construction?  And he said yes.  And you actually said that

 1    you had problems with the Court's claim construction?  And

 2    he said yes.

 3              And we are being blamed because we brought out

 4    the truth.  We brought out the truth.  This man is accusing

 5    us of infringement, and he doesn't even understand the law.

 6              Just imagine, let's say that, going back to the

 7    picket fence, you had your property and the neighbor of your

 8    property.  And after two years, which is what happened here,

 9    after two years of knowing that you are there, your neighbor

10    comes over and he says, you violated the law.  You, sir,

11    violated the law, he tells you.  And you say, well, wait a

12    minute.  What is the law?  And your neighbor says, I don't

13    know.  I have problems with it.  I don't understand it.  But

14    you violated it.  That much I know.

15              That's what they are saying.  He doesn't

16    understand a critical claim term, didn't bring it up, and

17    then all of a sudden in cross-examination the truth came

18    out.  He doesn't understand it.  Yet he has no problem

19    saying that we infringe.  That just cannot be.  That doesn't

20    make any sense.  His testimony is not credible.

21              Did you see Dr. Guerin, did you see what Dr.

22    Guerin said?  I am going to quote Dr. Guerin.  Dr. Guerin

23    said, as to the Court's definition of the term closing

24    prompt message, he said, quote, "There is absolutely no

25    ambiguity, none whatsoever.  It's pretty clear as far as I

am concerned and it's totally consistent with what's in the

patent.  Again, I just want to restate that my opinion is

that that there is absolutely no ambiguity in terms of the

interpretation of the closing prompt message as stated in

the Court's claim construction provided here."

Mr. Jones didn't understand the Court's claim

construction of closing prompt message but nevertheless had

any problem trying to tell you that we infringe.  Dr. Guerin

did understand the term.  He actually read the Court's claim

construction.  He actually looked at the patent and the

critical figures and he figured it out.  And that is the

difference.  That is why Dr. Guerin's testimony is credible

and Mr. Jones' testimony is not credible.

There is a good reason, and we found that out,

too, in terms of why they didn't understand it.

Let's go ahead and put two checkmarks here, for

two reasons, why you should not find Mr. Jones' testimony

credible, you should reject his testimony altogether.  And

if you reject his testimony, there is no expert testimony on

whether we infringe.

Okay.  Can we go to Slide 19.

Ladies and gentlemen, you see this figure?

Figure 10.  This is a critical figure.  If you remember, Dr.

Guerin spent a great deal of time walking you through this

figure.  You know why he walked you through this figure?

1    Because the Court referenced Figure 10 when it came up with

2    its claim construction.  You know who did not look at that

3    figure?  Mr. Jones.  Maybe now you can understand why he

4    didn't understand the Court's claim construction.  Mr. Jones

5    admitted that there is no other example that explains when a

6    closing prompt message is made.  Don't you remember this?

7    We went through this whole thing where we divided it up and

8    Dr. Guerin showed you the green zone and he showed you the

9    red zone and showed you this and he broke it down precisely

10   for where the information system call is completed and where

11   it is connected to the subscriber.  He broke it down for you

12   precisely.  And he said Figure 10 is critical.

13           Then on cross-examination, Mr. Groombridge tried

14   very hard to say, isn't it just an example?  Dr. Guerin

15   said, it isn't just an example.  Dr. Guerin said it is the

16   example to show when a closing prompt message is played.

17   And their expert, after accusing us of infringement for two

18   years, and seeing this, didn't even bother to look at this

19   particular figure, but had no problem testifying that even

20   though I didn't do my homework, nevertheless, the Court is

21   at fault because their claim construction is ambiguous.

22           We submit, you should reject that testimony,

23   because not only did he not understand it, he didn't even do

24   his homework.

25           Okay.  Now, we have all seen this, we have seen

1    the green and the red, famous colors, so I am just going to

2    move through this relatively quickly.  I just want to talk

3    about a couple of things.

4              By the way, before I forget, can we go back to

5    Slide 18?  I need to put something on my checklist.  Can we

6    put a check next to another reason why Mr. Jones' testimony

7    should be rejected.  That is because he didn't consider the

8    critical figure referenced by the Court in the claim

9    construction.

10             Now you have got three different reasons why Mr.

11   Jones' testimony should be rejected.

12             Guess what?  There is more.  Let's go back to

13   Slide 25, please.

14             Okay, I am just going to walk you through this,

15   because Mr. Groombridge brought up some interesting

16   information that I want to address.

17             We have seen all this.  I am not going to take

18   you through all this again.  You have already seen it.

19   There is one important point, ladies and gentlemen, I am

20   going to give you, not that we really need it, but I am

21   going to give you very quickly two other reasons why you

22   can't believe anything Mr. Jones said.  You see, Mr. Jones

23   said, agreed, as Mr. Pines said, the purpose of the closing

24   prompt message, the function, is to apply something during

25   that dead air.

1              So when you have asked to be connected -- so

2       going back to the example that Dr. Guerin talked about, you

3       call for the Best Western.  You have been given the number.

4       You have decided I want to be connected to the Best Western.

5       You don't want to hear any ads about anything about the

6       Holiday Inn.  You want to go to the Best Western.  While you

7       are waiting to be connected and you are sitting on the

8       phone, then an ad is played, because as Mr. Pines said,

9       there is dead air there.

10              It doesn't matter whether it is two or three or

11       four seconds.  But it was a good time to play that, because

12       the purpose is to fill the dead air.  That is the purpose of

13       the closing prompt message as defined in the patent.

14              That is the purpose.  Did you hear any testimony

15       over the course of the last five days that the purpose of

16       the Switch Pitch pad was to fill dead air?  Mr. Kliger was

17       cross-examined by Mr. Groombridge for some time.  Dr. Guerin

18       was cross-examined.  They had the chance.  There is no

19       testimony.  But you know why?  Because as Mr. Kliger said,

20       the purpose of the Switch Pitch ad, ladies and gentlemen, is

21       totally different.  It is totally different.  The purpose of

22       the Switch Pitch ad is, you are calling for Best Western,

23       you hear an ad for Holiday Inn, so before you get connected

24       to Holiday Inn, hey, you know what?  Holiday Inn's directory

25       assistance actually has it pretty good.  Maybe I will

1    switch.  The closing prompt message takes the "switch" out

2    of Switch Pitch.  The Switch Pitch ad is designed to get you

3    to switch.  The closing prompt ad is designed to fill dead

4    air.

5            There is no testimony about the fact that these

6    are similar purposes.  This idea somehow that they have the

7    same function is ridiculous.  They have completely different

8    functions.

9            In fact, Mr. Jones admitted that when we play

10   our ad during this period of time, ladies and gentlemen, he

11   did admit in that deposition, where he called the Court's

12   claim construction ambiguous, he actually did admit that,

13   yeah, you guys don't have a dead air problem here, I admit

14   that.  But it didn't stop him from testifying and trying to

15   tell you that it has the same purpose.

16           And that's why we have depositions, because then

17   we can keep people honest, we can hold them to their word.

18           Let's move on to the last things.  Let's go back

19   to our Slide 18 and put another checkmark there.

20           I only have one other thing to say.  Mr.

21   Groombridge said that we apparently do it in the same way.

22   I mean, let's just assume that he actually understood the

23   claim construction.  Let's assume that he didn't call it

24   ambiguous.  Let's assume that he actually looked at the

25   critical figure.

1           Let's assume that we had the same function, just

2    for laughs, let's just do that.  Then he said that there was

3    a very key part of the way that a closing prompt message is

4    generated.  And that way is called the call completion data

5    packet.

6           Can we go to Figure 19.  You don't have to know

7    what a call completion data packet is, and I am not going to

8    spend a lot of time telling you this.  What is important is

9    what the experts thought about it.

10           Right here, there is this thing called a call

11   completion data packet.  For reasons that I won't get into

12   but that the experts talked about, that is very, very

13   critical to generating a closing prompt message.

14           There are two people who actually specifically

15   cited the importance of a closing prompt message.  The first

16   person is His Honor, Judge Sleet.  In his opinion, he said,

17   he referenced the specification, portions of the patent that

18   talked about a call completion data packet.

19           Mr. Jones also said that a call completion data

20   packet is a, quote, "key part of the way the '969 closing

21   prompt message operates."  And then I asked him, did you

22   look at the source code of the Jingle system?  You may not

23   remember this.  And he said, I did.  I said, can you define

24   for the jury what the source code is?  He said, Well, the

25   source code is the precise instructions for how the system

1   operates.  And then I said, Isn't it true, sir that two

2   weeks ago, when Mr. Sokhol asked you a question at your

3   deposition, you said you could find no evidence of a call

4   completion data packet?  And he said, I did say that.

5          There is no evidence of a call complete data

6   packet.

7          So the Court said the call completion data

8   packet is a very important part of the way the closing

9   prompt message is generated.  Mr. Jones admitted it.  And

10  Mr. Jones said, however, that it isn't in our system.

11         So that's yet another reason why there is no

12  possible way that we can infringe this patent under the

13  doctrine of equivalents.

14         Let's go back to Slide 18 one last time.

15         I have now given you five different reasons why

16  Mr. Jones was wrong, five different ways that you can reject

17  his testimony.  And for that and because of that, we don't

18  infringe this patent.  And they know it.  They knew before

19  he got on the stand that he had said that the Court's claim

20  construction was ambiguous and they wanted to hide it.  But

21  I brought it up.  They knew before he got on the stand that

22  he had admitted that the purposes are different.  They knew

23  before he got on the stand that the ways that we do things

24  are totally different.  But that didn't stop him from trying

25  to point the finger at us and say we infringe.

1       So let's go to the conclusion on this.

2       Can we go to Slide 26, please.  Okay.  Just as

3   we did with the '371 patent, ladies and gentlemen, we can do

4   it a very easy way on this one as well.  We don't have a

5   closing prompt message.  They have no evidence of it.  They

6   know it.  We don't infringe under the doctrine of

7   equivalents.  And that's why I am going to take you to the

8   verdict form.

9       Again, these are dependent claims.  If you find

10  that we don't infringe Claim 1, you are done with this

11  patent.  You could just check off these boxes because these

12  are all dependent claims, Claim 5, Claim 20, Claim 25.  We

13  must have everything in Claim 1 and all the stuff here.  We

14  don't have anything in Claim 1, so we don't have any of the

15  stuff here.  So you can put X's through all these.

16      We have no infringement there, either.

17      Let's go to the verdict form.  We talked about

18  in the first patent, all you have had to do is check the box

19  for Claim 4.  And if you agree we don't infringe on those,

20  all you have to do is check the Box 1, and if you agree with

21  me that there is no evidence that we infringe under Claim 1,

22  you can automatically check these.  And guess what?  You are

23  done.  You are done with infringement.  And there is more

24  good news.  You don't have to worry about damages, because

25  if you don't find that we infringe either patent, you are

1    done with infringement and you are done with damages, and

2    you have only got one issue left.  And that is invalidity.

3              Now, I just want to touch on the damages

4    briefly.  I am going to speed through this very quickly

5    because you have heard a lot of testimony.

6              Can we go to Slide 29, please.

7              You may be wondering, wait a minute.  You guys

8    are telling us don't infringe.  How come you are talking to

9    us on damages?  It's sort of like Plan B.  In other words,

10   if you think that we infringe the patent, either the paid

11   for listing patent or the closing prompt message patent,

12   then what Mr. Evens and Mr. Banowit were trying to show you

13   is that their expert had highly inflated the amount of money

14   that we would owe even if you were to find infringement.  So

15   I am going to take you through this very quickly.

16             The damages in this case are minimal.

17   Basically, KGB is asking for a reasonable royalty on two

18   patents.  Our expert, who Mr. Banowit was talking to, I

19   believe it was yesterday, said that in the event that you

20   find the patent to be valid and infringed, so in other

21   words, if you say that we infringe it and you say that the

22   patent is valid, then and only then should you award

23   damages.  We are just saying that as part of Plan B, if you

24   make those two findings, then here is what the damages

25   should be according to us.  A two-percent royalty times a

1   royalty base.  You take the two percent times the royalty

2   base, and you get the damages.

3              One of the things that the parties have been

4   disputing is the thing called front-end ads.  You might see

5   it down there.  Front-end sponsorship.  Do you see that?

6              What KGB did is they added all that into their

7   damages calculation.  You know, that's interesting, because

8   KGB admitted before this case started that our front-end ads

9   don't infringe.  But that didn't stop them from putting it

10  in there.  So what we did was we took it out and we

11  recalculated the damages, subtracting all that out.  Now,

12  there are some theories that they could have tried to use

13  for damages to include those.  But they didn't.  There is

14  something called entire market value and some other things

15  you don't need to worry about.  They didn't do that.

16             So what I did was removed the front-end ads from

17  the '371 patent.  And I will do the same thing here.

18  Front-end sponsorship, do you see that?  Once again, they

19  included that in there and it's not supposed to be there

20  because they said we don't infringe.  Why would you include

21  something as part of damages when we don't infringe?  So we

22  took that out, too.  And once we subtracted that out, we got

23  a different number.  This number here, that is called the

24  royalty base.

25             Then we said, as Mr. Barry testified, you take

1    the 2.5 percent, times the royalty base, and this is the

2    damages that we would owe if and only if you find that we

3    infringe, which we don't think you should, and you find that

4    the patent is valid, and we believe it's invalid.  Then the

5    total amount that we would owe for the '371 patent at a

6    2-percent royalty would be 100,000, and then for the '969

7    patent it would be a 2-percent royalty at 253.  253,811.

8              Now, I want to talk for just a couple of minutes

9    about validity.  You heard about validity through Dr. Forys.

10   If you remember, he was the very animated guy at the end who

11   was talking and taking you through the references.  I want

12   to remind you of what happened.

13             You see, when these patents went through the

14   Patent Office, there were a number of references that were

15   not in front of the Patent Office.  I told you last week

16   that what we did was we hired somebody, and you met him in

17   person, Dr. Forys.  And Dr. Forys went, and he did his own

18   search, because he said, you know, I have got all this

19   experience in directory assistance.  I know this field cold.

20   These patents look invalid to me.  So I am going to go out

21   and find some of what they call the prior art.  I am going

22   to find some disclosures that show, prove, by clear and

23   convincing evidence, that this was in the prior art.  That's

24   exactly what he did and that's what he spent some time

25   talking about.  You heard Ms. Gordon and Dr. Forys going

1    back and forth.  And he was talking to you about all these

2    different references.  I promise you I am not going to go

3    through all the references.  I just want to give you the

4    highlights.  Dr. Forys focused on just a few references.

5         Let's go to the '371 patent.  You see that up

6    there, Paxson, right up here, do you see why all those

7    checkmarks are there?  Because Dr. Forys found all of those

8    references there.  He found every single one of these

9    references in the '371 patent.  He explained that the Paxson

10   patent discloses all of the elements of the asserted patent.

11   In other words, you call Paxson to get a suggestion of a

12   business in a category just such as taxes.  Dr. Forys, where

13   it says Molne, we talked about that quite a bit.  He said

14   that Molne disclosed a directory assistance call that

15   searches a database to obtain a list of business that

16   suggests one to the caller.  It is a very easy substitution,

17   that is what he was trying to explain.

18        None of these definitions were in front of the

19   Patent Office, ladies and gentlemen.  The Paxson reference,

20   according to him, discloses every single one of these

21   references, every single one of the elements in the asserted

22   claim.  So they asserted claims against us, and we defended

23   ourselves, and we found prior art that does exactly what

24   they did in their patent, and we found it many years before,

25   Paxson, Molne, Molne plus Buck, Molne plus Davis.  We found

1    all these references.  And we gave you three different

2    options here.

3            So if you find that Paxson invalidates, you

4    don't have to worry about these.  If you find that either

5    one of these invalidates, you don't have to worry about

6    Paxson.  We gave you three different options here.

7            Mr. Groombridge argued that these things don't

8    invalidate the claims.  Dr. Forys has 35 years of directory

9    assistance experience.  He is a man who talked in great

10   detail.  He is very passionate about it, because I think he

11   strongly believed, as he stated in his opinion, that the

12   claims of these patents are invalid.

13           You remember a long time ago I showed you, these

14   patents were filed at a time when there was lots, hundreds

15   and hundreds and hundreds of references out there.  That's

16   what Dr. Forys summarized for you.

17           Let's move on to the '969.  By the way, when you

18   get to your verdict form, what we would ask you to do is say

19   yes to all of these, all these claims are invalid.  They

20   have all been done before.  Dr. Forys explained that to you

21   in great detail.

22           Okay.  Let's talk about the Armstrong patent.

23   This is the last thing I am going to say.

24           With respect to the '969 patent, Dr. Forys

25   explained that the Armstrong patent discloses all of the

1   elements of the asserted claim.  It teaches a closing prompt

2   message with information other than the information

3   requested.  This is just what the claims cover.  Mr.

4   Groombridge last week said closing prompt messages, closing

5   prompts have been known for a long time.  Well, guess what?

6   We agreed.  And we found those references.  And Dr. Forys

7   explained that to you.  This idea of targeted advertising, I

8   believe what Mr. Groombridge said is that the patent was

9   about targeting, not timing.  Well, Dr. Forys explained in

10  great detail that even targeted advertising and a closing

11  prompt are well known from the combination of Armstrong and

12  Marino.

13          So we have given you two options here.

14  Armstrong discloses all of the references of the claims,

15  Armstrong plus Marino separately also does the same thing.

16  You can just pick one of those two.  If you find that we

17  have invalidated those claims, we would ask that you check

18  yes for all those.

19          And that's it.

20          So what we are asking you to do -- again, we

21  have given you all the evidence, we have shown you

22  everything.  We don't infringe the '371 patent.  We ask that

23  you check no on that.  We don't infringe the closing prompt

24  message.  We ask that you check no on that as well.  Then

25  you are done with infringement.  If you don't think that we

1    infringe the independent claims, you can just put checkmarks

2    no in all.  You don't have to worry about the damages.

3              The only other thing we ask you to do, if you

4    believe that what Dr. Forys was saying was true, if you

5    believe his evidence, if you believe all the work that he

6    did, if you believe he went and did his homework, if you

7    believe that he showed you by clear and convincing evidence

8    that those two patent claims were invalid, we ask you to

9    check yes on those.

10             So I want to say one last thing.  Do you

11   remember at the end of my presentation I showed you an

12   e-mail?  And it was this e-mail.  This e-mail was from

13   September 24th of 2006.  This was an e-mail from Mr. Maxwell

14   to Mr. Pines, the CEO.  And this was the e-mail.  It said:

15             When they figure it out -- meaning when

16   companies like Jingle who are offering free services figure

17        it out -- free will be a serious threat.  Most people

18        hate paying the $1.50 we need to buy or corner Jingle

19        and use it to our advantage over time or prepare for

20        further U.S. decline.

21             He said that.  Then, if you remember, at the end

22   of Mr. Pines' direct examination of Mr. Groombridge, he

23   tried to respond to this.  And I am going to just read you

24   what he said.

25             Now, Mr. Groombridge asked Mr. Pines about

1   this.

2           I have to tell you, I thought he was going to

3   stand up here and say I categorically deny everything.    I

4   never wanted him to say it.  He should have never   said it.

5   I disagree with everything that he said.

6           But he didn't say that.  Let me read you what he

7   said:

8           Reading this now, I cannot actually say I

9   disagree with this particular part of what he said.

10           Meaning Mr. Maxwell.  He was talking about this

11  e-mail, ladies and gentlemen.  He said:

12           I think I did at the time agree that most

13          consumers didn't like the Jingle product.

14           Of course, that's his opinion because he wants

15  to get rid of Jingle.

16           I think that automation was a big part of that.

17          When they do figure it out, I think free is a serious

18          threat.  I have always thought -- this is Mr. Pines --

19          I have always thought free is a serious threat.

20           This is what he said.

21           If you can economically provide a free service

22          to somebody that is of the same or at least meets

23          their caliber of quality that they need, why would you

24          ever pay for a service?

25           I agree with that.

1                    Then he said:

2                    So I do agree that people do hate paying $1.50.

3          That is not under my control.

4                    Wait a minute.  Let me see if I understand that.

5     Mr. Pines offers a paid directory assistance service.  He is

6     the one who requires people to pay.  And he only makes 30

7     cents a call, which is 300 million dollars, according to

8     what Mr. Groombridge said.  But it's not under his control?

9     That doesn't seem right.

10                   He goes on.

11                   So I think you know his sentiment -- meaning Mr.

12          Maxwell's sentiment -- that we need to buy or corner

13          Jingle may have been a little more enthusiasm than

14          perhaps he meant.

15                   Enthusiasm?  He was enthusiastic about trying to

16    corner Jingle?  Don't you think that if somebody sent an

17    e-mail like that to you, if you disagreed with it, you would

18    call that employee and say, you started here a month ago,

19    how dare you talk like that?  I don't agree with that at

20    all.

21                   Guess what?  That employee wasn't fired.  He was

22    there for six or seven more months.

23                   Then finally, Mr. Pines said:

24                   I would surmise providing a free directory

25          assistance is not economically viable.  Meaning he

1    doesn't think it can work economically.

2            We looked at it ourselves, we couldn't figure

3        out how to make money on it.  And I didn't think the

4        automation piece was high enough quality.

5            But really, automation or live, the question is,

6        can you provide an economical way?  And I don't think

7        we can.  Can you provide a free service in an

8        economical way?  I don't think we can.

9            That's what Mr. Pines said.

10           Mr. Kliger, stand up for a second.

11           (Mr. Kliger stands.)

12           Do you see this man?  He provided and provides a

13   free directory assistance service in an economical way.

14   They can't.  He can.  I think that says it all.  That's why

15   we are here.  And when it didn't work out, they sued us.

16   And that's the story, ladies and gentlemen.

17           I want to say one last thing.

18           I am done talking.  I don't know if Mr.

19   Groombridge has anything else to say.  But I do want, on

20   behalf of all of the lawyers and paralegals and graphics

21   people, on behalf of Jingle, we again greatly appreciate the

22   time that you have taken to listen to what we have to say,

23   to listen to our story.

24           And now we pass the baton to you.  As we have

25   said to you, you are a critical part of this process.  Chief

1    Judge Sleet provided you with the law.  We provided you with

2    the evidence.  Now, you have to go in, and we ask that you

3    do two things.  We ask that you deem that we did not

4    infringe these claims.  And we have shown you that evidence.

5    And we ask that you invalidate these patents because that's

6    what Dr. Forys said, because at the end of the day, that's

7    the truth.

8                    Thank you very much.

9                    THE COURT:  Thank you, Mr. Sabharwal.

10                   Do you have a rebuttal, Mr. Groombridge.

11                   MR. GROOMBRIDGE:  Just a little, Your Honor.

12                   Mr. Mok, put Slide 33 in our presentation up.

13                   I want to address just a few things that came

14   out.  I would just like to correct what might be some

15   misunderstandings perhaps.

16                   One thing Mr. Sabharwal said to you was, he

17   said, with respect to the '371 or the category listing

18   patent, well, we connect calls, do you see connected in the

19   claims?  And he had Claim 1 up there.  I suggest, ladies and

20   gentlemen, when you look not at Claim 1, but at Claim 8, you

21   will see right there, yes, you will see connect.  Not

22   connected.  But connecting.  Connecting the caller to a

23   business.

24                   So it really is beyond doubt or argument that

25   this patent covers connecting, a business, connecting a

1    caller to a business.

2              There has been a lot of discussion of Mr. Jones

3    in this case.  You have just heard some assertion that Mr.

4    Jones didn't do his homework.  Mr. Jones testified that he

5    certainly read these patents, that he read Figure 10 of the

6    patent.  And moreover, that between him and his assistant,

7    they went through 1100 pages of computer code.  So we

8    certainly can't fault Mr. Jones for an unwillingness to do

9    his homework.

10             Mr. Jones is a very precise man.  That's why he

11   differentiates between the past tense and the past

12   participle.  He never does things without having thought

13   about them.

14             You are the ones to judge whether you think he

15   was telling the truth or not.  That is your job.  We will

16   take our chances.

17             With respect to the assertions that he did not

18   follow the Court's claim construction, unlike you, I have

19   the unfair advantage that I have a transcript, courtesy of

20   this fine gentleman here.  And I would like to read you a

21   couple of things from that transcript.  This is one of the

22   questions and answers from Mr. Jones:

23             Question:  I think we will come to that in a

24        moment.  My question more generally is have you

25        endeavored to follow the Court's claim construction?

1    **Answer:  Yes.  There were several claim**

2    **constructions and I adopted those into my reading of**

3    **the claims.**

4    **There is no doubt that he followed the Court's**

5    **claim construction.**

6    **There was a suggestion that he had said that the**

7    **function here, the function of the closing prompt message is**

8    **to fill up dead air.  Now, I don't want you to take my word**

9    **for it.  I would just like to read the question and answer**

10   **in which he dealt with that issue.**

11   **Question:  What is your opinion as to the**

12   **function of the closing prompt message?**

13   **Answer:  The function is fundamentally taken**

14   **from the purpose stated by the inventor in part of the**

15   **patent application where he states the prior art had**

16   **not really taken advantage at the time after**

17   **retrieving the required telephone number and before**

18   **ending the call with a connection or ending.**

19   **And he proposed that this patent covers the idea**

20   **of playing the targeted message of any sort at that time to**

21   **make use of that time, constructive, meaningful use of that**

22   **time.**

23   **Nothing at all about dead air.**

24   **We also heard from Mr. Sabharwal a reference to**

25   **the hundreds and hundreds and hundreds of references, prior**

1  art references.  Ladies and gentlemen, it's certainly true,

2  there is a lot of prior art references.  If Jingle wants to

3  do anything that's in one of those hundreds and hundreds of

4  prior art references, it can.  The reason we are here is

5  because they are not doing that.  They are doing what is in

6  these patents.

7                Now, the one thing that I certainly think we can

8  all agree on is that we owe you heartfelt thanks.  We

9  understand that this is taking quite a bite out of your

10  lives.  I recognize it is a huge thing.  We are very

11  grateful to you, I think all of us in this courtroom.

12                And we are in your hands.

13                I have nothing further to say to you but:  Thank

14  you.

15                THE COURT:  Thank you, Mr. Groombridge.

16                Ms. Walker, swear the jury officer.

17                (At this point the jury officer was sworn.)

18                THE COURT:  Ladies and gentlemen, you are free

19  to commence your deliberations.

20                (At 3:16 p.m. the jury retired to deliberate.)

21                THE COURT:  Let me see counsel off the record.

22                (The following took place at sidebar.)

23                THE COURT:  One of the jurors advised Ms. Walker

24  that he takes a bus from here to Smyrna.  He needs to leave

25  by 4:45.  His fellow jurors are in accord with that.  I

1    doubt seriously -- I was going to dismiss them at 5 anyway

2    today.  I would be surprised if they had a verdict by then.

3                    MR. GROOMBRIDGE:  I would be surprised, too.

4                    THE COURT:  You don't need to be here.  I will

5    simply dismiss the jury at 4:45, if not before.

6                    They may decide they just want to select a

7    foreperson and leave.

8                    I am going to leave it entirely in their hands

9    as to whether they want to commence their deliberations

10   today or to go home and begin tomorrow.  I am assuming there

11   is no objection to that?

12                   MR. SABHARWAL:  No objection.

13                   MR. GROOMBRIDGE:  No.

14                   THE COURT:  (Addressing Chief Deputy Clerk

15   Walker:  You can tell them they are certainly free to leave

16   by 4:45.  But the Judge recommends if they are not going to

17   begin deliberations today, that they at least pick a

18   foreperson.

19                        (End of sidebar conference.)

20                        (Court recessed.)

21

22

23

24

25